**Beverly FINK, Plaintiff,**

v.

**Susan KITZMAN, Grundy County, Iowa, and the Grundy County Board of Supervisors, Defendants.**

**No. C 93–0127.**

United States District Court,
N.D. Iowa,
Cedar Rapids Division.

March 29, 1995.

1354

Roger J. Kuhle and John O. Haraldson of the Law Offices of Roger J. Kuhle, P.C., in West Des Moines, IA, for plaintiff, Beverly Fink.

Nathan A. Callahan of Dunakey, Klatt & Callahan, P.C., in Waterloo, IA, for defendants.

## MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

BENNETT, District Judge.

### TABLE OF CONTENTS

I. INTRODUCTION AND PROCEDURAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1356

II. STANDARDS FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1357

III. FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1358
 A. Undisputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1358
 B. Disputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1359

IV. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1360

A. Age Discrimination And Reductions In Force ...................................1360
 1. Fink's Federal Age Discrimination Claim ..........................1360
 a. Administrative prerequisites to suit under the ADEA......................1360
 b. The analytical framework for claims of age discrimination...............1361
 c. The prima facie case under the ADEA in a reduction-in-force case .......1363
 d. Fink's *prima facie* case and showing of pretext ..........................1364
 2. Age Discrimination Under Iowa Law ......................................1366
B. Disability Discrimination ..........................................................1367
 1. The Origins Of The ADA ...................................................1368
 2. Disability Discrimination Under The ADA ...............................1371
 a. Analytical framework for ADA claims ................................1373
 b. The prima facie case under the ADA ................................1373
 c. Fink's prima facie case ...........................................1376
 2. Elements Of A Disability Discrimination Claim Under Iowa Law ..............1377
 a. Protected disability...............................................1378
 b. Fink's disability.................................................1378
C. Retaliation For Filing A Workers Compensation Claim ...........................1379
 1. Recognition Of The Public Policy Exception Under Iowa Law ................1379
 2. Discharge For Filing A Workers Compensation Claim .....................1381
D. Intentional Interference With Employment Contract ............................1382
 1. Interference With A Contract ............................................1382
 2. Interference With Business Advantages Or Relations .....................1382
E. Breach Of Covenant Of Good Faith And Fair Dealing .............................1383
F. Implied Contract..................................................................1384
 1. The implied contract exception to at-will employment .......................1385
 2. Fink's Implied Contract Claim ..........................................1386
G. Discrimination Based On Political Affiliation Or Opinions........................1387
H. Fink's Damages Claims ...........................................................1387
 a. Punitive damages under Iowa Code Ch. 216 and Ch. 670 .................1387
 i. Punitive damages under Iowa Code Ch. 216 ..........................1388
 ii. Municipal immunity from punitive damages under Iowa Code Ch. 670....1388
 b. Liability for liquidated damages under the ADEA .........................1390
 c. Kitzman's liability .................................................1391
I. Immunity Of The Grundy County Board Of Supervisors .........................1393
 1. Standards for quasi-judicial immunity.....................................1393
 2. Quasi-judicial immunity of elected boards ...............................1395
 3. The Board's claim of quasi-judicial immunity ...............................1398

V. CONCLUSION .......................................................1398

In this employment discrimination case, the discharged employee has proceeded in the now typical fashion by presenting a cornucopia of federal and state statutory claims and state common-law causes of action. The employer has also responded in kind with a bounty of defenses, including the familiar employer's incantation that the plaintiff has failed to generate a *prima facie* case of discrimination or failed to allege a claim supportable in law or fact. These claims and defenses must, of course, be treated with proper consideration. However, in addition to these familiar issues in employment litigation, the employer has introduced novel issues of common-law and statutory immunity of municipal employers and officials and quasi-judicial immunity of a local elected governmental board, which acted as an appellate body reviewing the employee's grievance arising from her discharge.

A former county employee has brought suit against her former supervisor, the county treasurer, as well as the county and the county board of supervisors alleging age and disability discrimination in violation of both federal and state law, plus state-law claims of retaliation for filing a workers compensation claim, intentional interference with an employment relationship, breach of covenant of good faith and fair dealing, breach of a covenant or implied contract to discharge only for good cause, and retaliation for political opinions or affiliations.

The county board of supervisors has moved for summary judgment on the ground that it has absolute quasi-judicial immunity, because it acted only in a judicial capacity in reviewing the county treasurer's decision to terminate the plaintiff. All defendants have moved for summary judgment asserting that the plaintiff cannot make out the necessary

*prima facie* case on her discrimination claims, and further on the ground that they have offered an unrebutted legitimate reason, a reduction in force (RIF), for the termination. Defendants also raise specific arguments that the remaining claims are unsupportable in either law or fact, and attacking plaintiff's assertions of liability and punitive or liquidated damages against them.

## I. INTRODUCTION AND PROCEDURAL BACKGROUND

Plaintiff Beverly Fink filed her petition at law in this matter in the Iowa district court in and for Grundy County on April 23, 1993, and demanded jury trial of all of the issues presented. Counsel for defendants entered an appearance in the state court proceedings on May 5, 1993, and filed a notice of removal of this action to this federal court on May 10, 1993. Defendants answered the petition at law in state court on May 13, 1993, then filed a copy of the answer in federal court as a supplement to their Rule 20 list of pleadings filed in state court. On May 26, 1993, defendants also filed a jury demand on all issues presented in the petition, now properly called a complaint.

Fink's complaint is in eight counts each alleging violations of either federal or state law, or both, arising from her discharge from her position as a "motor vehicle specialist" in the Grundy County Treasurer's Office on August 31, 1992, when she was 52 years old, after approximately twenty-five years of employment with the Treasurer's Office. The defendants are Susan Kitzman, who was the Grundy County Treasurer and Fink's supervisor, the Grundy County Board of Supervisors, and Grundy County, Iowa.

Count I of the complaint alleges that Fink was discharged in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.*, and similar provisions of Iowa's Civil Rights Act, Iowa Code § 216.6. Count II alleges disability discrimination in violation of Iowa Code § 216.6, the Americans With Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*, and 42 U.S.C. § 2000e as amended by the Civil Rights Act of 1991, Pub.L. 102–166, Nov. 21, 1991, 105 Stat. 1071. This count asserts that Fink's disability is carpal tunnel syndrome, for which she underwent surgery in January of 1992. Count III alleges retaliatory discharge as the result of filing a workers compensation claim in connection with Fink's carpal tunnel syndrome. Count IV alleges intentional interference on the part of Kitzman with Fink's employment relationship with Grundy County. Count V alleges that Fink's termination was in breach of an implied in fact covenant of good faith and fair dealing which required that she be discharged only for good cause. Count VI alleges that Fink's termination was in violation of an implied in law covenant or contract of good faith and fair dealing which required that Fink be discharged only for good cause. Count VII alleges that Fink's discharge violated an implied unilateral contract based on an ordinance of Grundy County which required that Fink be discharged only for good cause. Count VIII, the final count of the complaint, alleges that Fink was discharged in violation of a Grundy County ordinance that prohibits any discrimination based upon political opinions or affiliations.

On July 18, 1994, the Grundy County Board of Supervisors filed a motion for summary judgment asserting that it was entitled to judicial or quasi-judicial immunity on Fink's claims. The Board argues that it acted in a judicial capacity in hearing Fink's grievance about her termination, thus serving as a board of appeal on an administrative decision. Fink resisted that motion for summary judgment on August 1, 1994, but, by leave of court, did not file a brief in support of her resistance until September 23, 1994. The Grundy County Board of Supervisors filed a reply to Fink's resistance August 4, 1994, however. In the interim, on August 1, 1994, all defendants moved for summary judgment on all of the claims in Fink's complaint. Fink resisted both motions for summary judgment on September 6, 1994, and filed a brief in resistance to the motions for summary judgment on September 23, 1994. On February 1, 1995, Fink moved to add additional authorities to her brief in resistance to the motions for summary judgment.

On February 3, 1995, this matter was reassigned to me following my appointment as a district judge for the U.S. District Court for

the Northern District of Iowa on August 26, 1994. This matter is now fully submitted, the court enters its ruling on the motions for summary judgment.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir. 1992).

▮ The standard for granting summary judgment is well established. *Rule 56* of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affida-*

*vits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[1] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here Fink, and give Fink the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael,* 28 F.3d 795, 796 (8th Cir.1994); *Allison v. Flexway Trucking, Inc.,* 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.,* 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene,* 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield,* 939 F.2d 666, 667 (8th Cir.1991), *cert. denied,* 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

▮ Procedurally, the moving parties, here all defendants, Kitzman, Grundy County, and the Grundy County Board of Supervisors, bear "the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553); *see also Reed v. Woodruff County, Ark.,* 7 F.3d 808, 810 (8th Cir.1993). The defendants are not required by *Rule 56* to support their motions with affidavits or other similar materials negating the opponent's claim. *Id.*

---

1. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel v. Norman,* 953 F.2d 394 (8th Cir.1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Hartnagel,* 953 F.2d at 394.

■ "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1355. Fink is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553. Although "direct proof is not required to create a jury question, . . . to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.' " *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Products, Inc. v. Herrick*, 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bankers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994).

■ In *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510, *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2553–54, and *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). If Fink fails to make a sufficient showing of an essential element of a claim with respect to which she has the burden of proof, then the defendants are "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247. With these standards in mind, the court turns to consideration of the defendants' motions for summary judgment.

■ The Eighth Circuit Court of Appeals has cautioned that "summary judgment should seldom be used in employment-discrimination cases." *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir.1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir.1991); *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 364 (8th Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)); *see also Hardin v. Hussmann Corp.*, 45 F.3d 262, 264 (8th Cir.1995) ("summary judgments should only be used sparingly in employment discrimination cases," citing *Haglof v. Northwest Rehabilitation, Inc.*, 910 F.2d 492, 495 (8th Cir.1990); *Hillebrand*, 827 F.2d at 364). Summary judgment is appropriate only in "those rare instances where there is no dispute of fact and where there exists only one conclusion." *Crawford*, 37 F.3d at 1341 (quoting *Johnson*, 931 F.2d at 1244). The court reasoned that "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." *Id.* (holding that there was a genuine issue of material fact precluding summary judgment); *Johnson*, 931 F.2d at 1244. With these standards in mind, the court turns to consideration of the defendants' motions for summary judgment.

### III. FINDINGS OF FACT

#### A. Undisputed Facts

The record reveals that the following facts are not in dispute. In August of 1992, Fink,

who was 52 years old, had been employed in the Grundy County Treasurer's Office for approximately twenty-five years. Although she had for some time been designated a deputy treasurer, in January of 1991, Fink and a coworker were redesignated as "Motor Vehicle Specialists" by the County Treasurer, defendant Kitzman.

Kitzman was first appointed to the post of County Treasurer on May 1, 1989, over other applicants to fill the position temporarily, including Fink. Kitzman was subsequently elected to the position in November of 1990. It appears from the complaint that Fink was approached as a candidate to run against Kitzman in the next election, but Fink asserts that she did not intend to run for election to the Grundy County Treasurer's position.

During her employment with the County, Fink suffered from carpal tunnel syndrome. She was off work for some days in late 1991, and underwent surgery for the condition in January of 1992, during which time she also missed some days of work. However, she returned to work, with the only restriction placed upon her activities that she not lift heavy objects. This restriction does not appear to have impeded her performance of her job. Fink applied for workers compensation benefits for her carpal tunnel syndrome on the ground that such a condition was work-related. Fink did eventually obtain some workers compensation benefits.

On August 31, 1992, Kitzman gave Fink notice of termination of her employment in the County Treasurer's Office. Kitzman admits that prior to terminating Fink, she attempted to secure the voluntary retirement of the other "Motor Vehicle Specialist," who was a few years older than Fink. Kitzman has always asserted that her decision to terminate Fink was because Kitzman believed that the Treasurer's Office was overstaffed owing to declining workload, which in turn resulted from a decline in population in the county. However, Kitzman admits that she decided who to terminate and when that termination should take place within the space of about half-an-hour. Kitzman notified the Grundy County Board of Supervisors of her decision to terminate Kitzman. By

statute, Kitzman did not need authority from the Board to terminate an employee, nor did she seek such approval. *See* Iowa Code Ch. 331. Fink's position has since been eliminated by the Board and is no longer funded. No one was hired to replace Fink.

Fink appealed her dismissal to the Grundy County Board of Supervisors. The Board, following an adversarial proceeding at which Fink was represented by counsel, affirmed Kitzman's decision to terminate Fink.

### B. Disputed Facts

There is a considerable dispute of fact over the reason or reasons for Fink's termination. Kitzman asserts that she decided to reduce staff, without any directive from the Board, because technological and administrative changes, and a drop in the County's population, justified such a reduction. Kitzman states that she chose to terminate Fink in order to reduce staffing in her office, as opposed to other employees, some of whom were younger and less experienced that Fink, because of Fink's attitude, as demonstrated by Fink's decision to take a vacation during one of the busy periods in the year for the Treasurer's Office, and because of complaints about Fink from members of the public who had business in the treasurer's office. Kitzman does not assert that these grounds were "good cause" for termination, only that they are the reasons Fink was chosen out of the possible employees to be terminated. Kitzman asserts that the "good cause" for her decision to terminate Fink was the need to reduce staff.

Fink contends that Kitzman fired her because of her age, and because Kitzman perceived her to be disabled. Additionally, Fink contends that Kitzman fired her in retaliation for filing a workers compensation claim. Fink points to evidence that younger employees with fewer years of service were retained when she was terminated. She also points to Kitzman's efforts to compel the only employee in the office older than Fink to retire as suggesting that Kitzman intended to remove older employees. Fink also asserts that Kitzman perceived her to be disabled because of her affliction with carpal tunnel syndrome. Fink states that Kitzman told

her on more than one occasion not to attempt to get money out of the county for her carpal tunnel treatment. Kitzman counters that she did not know Fink ever obtained any money from the county, and, in fact, that it was her understanding that Fink's worker's compensation claim had been denied.

## IV. LEGAL ANALYSIS

The court deems it most appropriate to address the motion for summary judgment filed by all of the defendants as to each of Fink's claims *seriatim.* The court will then return to the question raised by the motion for summary judgment of defendant Grundy County Board of Supervisors, which is whether that body is entitled to judicial or quasi-judicial immunity for its actions in affirming Kitzman's discharge of Fink. The court's analysis of the motion for summary judgment filed by all of the defendants therefore begins with discussion of Fink's age discrimination claims and defendants' proffer of a legitimate reason, a reduction in force, or RIF, for their decision to terminate Fink.

### A. Age Discrimination And Reductions In Force

Fink has brought her age discrimination claims under both federal law, specifically, the ADEA, 29 U.S.C. § 621 *et seq.,* and under Iowa state law, found in Iowa Code Ch. 216 (formerly chapter 601A). The analysis of an age discrimination in employment claim begins with examination of the goals and prerequisites for suit under the ADEA and determination of the proper allocation of the burdens of proof on such a claim. This course is particularly appropriate, as Iowa applies the analytical framework and standards articulated in federal cases to claims

under chapter 216, a matter the court will address further below. The court will therefore examine Fink's ADEA claim first, then turn to her state age discrimination claim.

### 1. Fink's Federal Age Discrimination Claim

The ADEA's goal is to "promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U.S.C. § 621(b). Thus, the ADEA forbids employment discrimination against employees aged forty and older. 29 U.S.C. § 631(a); *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 448 (8th Cir.1993). It provides that it is unlawful for an employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).[2]

### a. Administrative prerequisites to suit under the ADEA

██ The ADEA requires that within 180 days of the alleged unlawful conduct by an employer, the employee file a charge outlining the unlawful conduct with the Equal Employment Opportunity Commission (EEOC). 29 U.S.C. § 626(d) (1982).[3] The EEOC then notifies the employer and seeks "to eliminate any alleged unlawful practice by informal methods of conciliation, conference, and persuasion." *Id.* If the parties have not compromised after 60 days, the employee can file a civil suit under the ADEA. *Id. See also*

2. The ADEA prohibitions protect workers over age forty. 29 U.S.C. § 631(a). As originally enacted, the ADEA covered employees from 40 to 65 years old. Pub.L. No. 90–202, § 12, 81 Stat. 607 (repealed 1978). The maximum age was raised in 1978 to cover persons aged 40 to 70 years. Pub.L. No. 95–256, § 4, 81 Stat. 607 (repealed 1986). In 1986 Congress removed the upper age limitation entirely, Pub.L. No. 99–592, § 2, 100 Stat. 3342–43 (codified at 29 U.S.C. § 631(a)), except for bona fide mandatory retirement laws for firefighters and law enforcement officers, *Id.* §§ 3–4, 100 Stat. 3342–43 (codified at 29 U.S.C. § 623(i), and tenure for college

professors over age 70. *Id.* § 6, 100 Stat. 3344 (codified at 29 U.S.C. § 631(d)).

3. 29 U.S.C. § 626(d)(1) states the following:

No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission. Such a charge shall be filed—
 (1) within 180 days after the alleged unlawful practice occurred ...

*Lorillard v. Pons,* 434 U.S. 575, 580, 98 S.Ct. 866, 870, 55 L.Ed.2d 40 (1978) (notice must be given of the intention to sue so that the EEOC or Secretary of Labor can attempt to eliminate the alleged unlawful practice through informal methods); *Brooks v. Monroe Sys. For Business, Inc.,* 873 F.2d 202, 205 (8th Cir.) ("The ADEA states that a civil action may not be commenced until sixty days after a charge alleging unlawful discrimination has been filed with the EEOC," citing 29 U.S.C. § 626(d)), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989).[4] Filing with the EEOC is a condition precedent to later filing a suit under the ADEA. *Boge v. Ringland–Johnson–Crowley Co.,* 976 F.2d 448, 450–51 (8th Cir.1992) (filing of charge with EEOC is required before employee may initiate a civil suit under the ADEA); *Heideman v. PFL, Inc.,* 904 F.2d 1262, 1265 (8th Cir.1990) (filing with EEOC is a "prerequisite" to suit under the ADEA), *cert. denied,* 498 U.S. 1026, 111 S.Ct. 676, 112 L.Ed.2d 668 (1991); *Walker v. St. Anthony's Medical Ctr.,* 881 F.2d 554, 556 (8th Cir.1989) (timely filing of EEOC charge is "prerequisite" to suit); *Brooks,* 873 F.2d at 205 (EEOC filing is a "condition precedent" to suit under the ADEA); *Kriegesmann v. Barry–Wehmiller Co.,* 739 F.2d 357 (8th Cir.) (EEOC filing is condition precedent to suit), *cert. denied,* 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984). Fink has met this prerequisite for filing suit under the ADEA.

#### b. The analytical framework for claims of age discrimination

■ The allocation of the burden of proof in ADEA cases has been held to be the same as in cases arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to

2000e–17 (1988). *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 448 (8th Cir.1993); *Beshears v. Asbill,* 930 F.2d 1348, 1353 nn. 6 & 7 (8th Cir.1991). *See also Wallis v. J.R. Simplot Co.,* 26 F.3d 885, 888–89 (9th Cir. 1994) (citing *Rose v. Wells Fargo & Co.,* 902 F.2d 1417, 1420 (9th Cir.1990)); *Hairston v. Gainesville Sun Publishing Co.,* 9 F.3d 913, 919 (11th Cir.1993) (citing *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989)); *Faulkner v. Super Valu Stores, Inc.,* 3 F.3d 1419, 1425 n. 2 (10th Cir.1993) (citing *MacDonald v. Eastern Wyoming Mental Health Ctr.,* 941 F.2d 1115, 1119 (10th Cir.1991)); *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 180 (2d Cir.1992) (citing *Grant v. Hazelett Strip–Casting Corp.,* 880 F.2d 1564, 1568 (2d Cir.1989)); *United States EEOC v. Century Broadcasting Corp.,* 957 F.2d 1446, 1450 (7th Cir.1992) (citing *Karazanos v. Navistar Int'l Transp. Corp.,* 948 F.2d 332, 335 (7th Cir.1991)). Similarly, the burdens of establishing a *prima facie* case of discrimination are the same under the ADEA, Title VII, and § 1983. *Hicks v. St. Mary's Honor Ctr.,* 970 F.2d 487, 490–91 (8th Cir.1992), *rev'd on other grounds,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Richmond v. Board of Regents of the Univ. of Minnesota,* 957 F.2d 595, 598 (8th Cir.1992) (burden of showing *prima facie* case of discrimination is the same under Title VII, § 1981, § 1983, or the ADEA).

■ It is axiomatic that employment discrimination need not be proved by direct evidence, and indeed, that doing so is often impossible, because, as the Supreme Court has said, "There will seldom be 'eyewitness' testimony as to the employer's mental processes." *Gaworski v. ITT Commercial Fin.*

---

4. A *federal* employee claiming age discrimination in violation of the ADEA

has the option of bringing suit in federal court in the first instance, or of pursuing administrative remedies before the EEOC and then suing in federal court if not satisfied with the administrative results. *See* 29 U.S.C. § 633a(b) and (c). With respect to civil actions brought directly to federal court, the federal employee must give the EEOC notice of intent to sue within 180 days of the alleged discriminatory conduct, and then must wait 30 days before filing suit. *Id.* § 633a(d). The ADEA provisions applicable to federal employees who pur-

sue administrative remedies before initiating a private suit do not, however, contain an express statute of limitations to govern how long after final agency action the employee has to file a civil action. We must therefore "borrow" an appropriate limitations period from an analogous state or federal provision. *Stevens v. Department of Treasury,* 500 U.S. 1, 7, 111 S.Ct. 1562, 1567, 114 L.Ed.2d 1 (1991). *Long v. Frank,* 22 F.3d 54, 56 (2d Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 938, 130 L.Ed.2d 883 (1995); *see also Adler v. Espy,* 35 F.3d 263, 264 (7th Cir.1994).

*Corp.,* 17 F.3d 1104, 1108 (8th Cir.) (citing *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983)), *cert. denied,* —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994). Thus, in employment discrimination cases based on circumstantial evidence, courts apply the analytical framework of shifting burdens developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981), and most recently in *St. Mary's Honor Ctr. v. Hicks,* —— U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *Gaworski,* 17 F.3d at 1108.

■ Under *McDonnell Douglas* and its progeny, the employment discrimination plaintiff has the initial burden of establishing a *prima facie* case of discrimination by producing evidence that would entitle the plaintiff to prevail unless contradicted and overcome by evidence produced by the defendant. *White v. McDonnell Douglas Corp.,* 985 F.2d 434, 435 (8th Cir.1993). To establish a *prima facie* case of discrimination under Title VII, the ADEA, or § 1983, the plaintiff must show that the defendant terminated the plaintiff under circumstances which gave rise to an inference of unlawful discrimination. *Davenport v. Riverview Gardens Sch. Dist.,* 30 F.3d 940, 945 (8th Cir.1994); *Johnson v. Minnesota Historical Soc'y,* 931 F.2d 1239, 1242 (8th Cir.1991) (Title VII discriminatory discharge case).

■ If a *prima facie* case is established, the burden then shifts to the employer to rebut the presumption by producing evidence that the employer made the questioned employment decision for a legitimate, non-discriminatory reason. *White,* 985 F.2d at 435. The employer's explanation of its actions must be "clear and reasonably specific," *Burdine,* 450 U.S. at 258, 101 S.Ct. at 1096, but the employer's burden of production has nonetheless been held to be "exceedingly light." *Batey v. Stone,* 24 F.3d 1330, 1334 (11th Cir.1994) (citing *Meeks v. Computer Assocs. Int'l,* 15 F.3d 1013, 1019 (11th Cir.1994)). If the employer meets this bur-

den of production, the legal presumption that would justify a judgment as a matter of law based on the plaintiff's *prima facie* case "simply drops out of the picture," and the plaintiff bears the burden of persuading the finder of fact that the proffered reasons are pretextual and that the employment decision was the result of discriminatory intent. *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749.

■ The Supreme Court has made clear that the ultimate inquiry is whether the employer intentionally discriminated against the plaintiff. *United States Postal Serv. Bd. of Governors v. Aikens,* 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983); *White v. McDonnell Douglas Corp.,* 985 F.2d 434, 436 (8th Cir.1993); *United States v. Johnson,* 28 F.3d 1487, 1494 (8th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 768, 130 L.Ed.2d 664 (1995); *Johnson,* 931 F.2d at 1242; *Brooks v. Monroe Systems For Business, Inc.,* 873 F.2d 202, 204 (8th Cir.), *cert. denied,* 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989); *Washburn v. Kansas City Life Ins. Co.,* 831 F.2d 1404, 1408 (8th Cir.1987). However, if the defendant's proffered reasons are rejected, the trier of fact may infer the ultimate fact of intentional discrimination. *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749 ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination."); *Harvey v. Anheuser–Busch, Inc.,* 38 F.3d 968, 971 (8th Cir.1994) (quoting *St. Mary's* ); *EEOC v. Cherry–Burrell Corp.,* 35 F.3d 356, 361 (9th Cir.1994) (quoting *St. Mary's* ); *Gaworski,* 17 F.3d at 1109 (quoting *St. Mary's* ); *Hicks v. St. Mary's Honor Ctr.,* 2 F.3d 265, 266 (8th Cir.1994) (quoting *St. Mary's,* —— U.S. at ——, 113 S.Ct. at 2749); *Brooks,* 873 F.2d at 204 (submission by the employer of a discredited reason for discharging or failing to promote a person is itself evidence of discriminatory motive.).

In two recent decisions, the Eighth Circuit Court of Appeals has considered in more detail the plaintiff's burden to show discriminatory intent when the employer has offered a legitimate, non-discriminatory reason for

its actions. *See Lidge–Myrtil v. Deere & Co.*, 49 F.3d 1308 (8th Cir.1995); *Krenik v. County of Le Sueur, Minn.*, 47 F.3d 953 (8th Cir.1995). In *Krenik*, the court held that

> [t]o survive summary judgment at the third stage of the *McDonnell Douglas* analysis, a plaintiff must demonstrate the existence of evidence of some additional facts that would allow a jury to find that the defendant's proffered reason is pretext and that the real reason for its action was intentional discrimination. *St. Mary's Honor Center*, —— U.S. at ——, 113 S.Ct. at 2747. These additional facts may be limited solely to proof of pretext....

*Krenik*, 47 F.3d at 958; *Lidge–Myrtil*, 49 F.3d at 1310 (the plaintiff "must produce 'some additional evidence beyond the elements of the *prima facie* case' that would allow a rational jury to reject [the employer's] proffered reasons as a mere pretext for discrimination," quoting *Krenik* ). In *Krenik*, the court noted that the "additional facts" could be limited to evidence that would cast disbelief and a suspicion of mendacity upon the employer's proffered legitimate reasons, citing *St. Mary's Honor Center*, —— U.S. at ——, 113 S.Ct. at 2749, but the court held that the plaintiff must produce "some additional evidence beyond the elements of the *prima facie* case to support a finding of pretext. Thus, [plaintiff's] argument that she was entitled to a full trial once both parties had met their initial burdens fails as a matter of law." *Krenik*, 47 F.3d at 959. In *Lidge–Myrtil*, the court held, first, that the plaintiff's abilities alone cannot rebut the employer's stated reasons for its action. *Lidge–Myrtil*, 49 F.3d at 1310. Next, the court rejected as inadequate plaintiff's "additional facts" in the form of a "single offhand hearsay comment by an unnamed co-worker" offered as proving discriminatory animus on the part of the employer. *Id.* at 1311. Finally, the plaintiff was unable to produce persuasive evidence of disparate treatment because she could identify no comparably situated employees not of her protected class who were treated differently. *Id.*

 The court will therefore consider, if Fink presents an adequate *prima facie* case, if she has also presented "additional facts" to rebut the defendants' proffer of a legitimate, non-discriminatory reason for her discharge sufficient to create a genuine issue of material fact as to discriminatory intent. However, the finding of discriminatory intent is generally for the trier of fact. *Burger v. McGilley Memorial Chapels, Inc.*, 856 F.2d 1046, 1047 (8th Cir.1988).

### c. The prima facie case under the ADEA in a reduction-in-force case

 The importance of the *prima facie* showing is that it creates the inference that the employer terminated the plaintiff for an impermissible reason. *Hardin*, 45 F.3d at 264. However, the *prima facie* case criteria differ for each type of employment decision. *Davenport*, 30 F.3d at 944; *Hervey v. City of Little Rock*, 787 F.2d 1223, 1231 (8th Cir. 1986). Thus, in a case alleging age discrimination, the usual elements of the *prima facie* case are: (1) that the plaintiff was a member of a protected group on the basis of his or her age; (2) that the plaintiff was performing his or her job at a level that met the employer's legitimate expectations; (3) that plaintiff was discharged; and (4) that the employer replaced or attempted to replace the plaintiff with a younger person. *Radabaugh*, 997 F.2d at 447; *Beshears*, 930 F.2d at 1353; *Raschick v. Prudent Supply, Inc.*, 830 F.2d 1497, 1499 (8th Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988); *see also Rinehart v. City of Independence, Mo.*, 35 F.3d 1263, 1265–66 (8th Cir. 1994) (in an ADEA case, it is not necessary that the plaintiff be replaced with a person from outside the protected class, only that the plaintiff be replaced by a *younger* person).

However, as this case involves a discharge in the context of a purported reduction in force, a further modification of the *prima facie* case is necessary. In the context of a reduction in force, the fourth element of the *McDonnell Douglas prima facie* case cannot be shown because the position is not filled by another or left open, but eliminated or combined with another position. *Hardin*, 45 F.3d at 264; *Hillebrand*, 827 F.2d at 364; *Holley v. Sanyo Mfg., Inc.*, 771 F.2d 1161, 1164–65 (8th Cir.1985). Thus, in *Holley*, the

Eighth Circuit Court of Appeals held that the plaintiff in a reduction in force case must meet the first three requirements of the *McDonnell Douglas* prima facie showing and "must come forward with additional ... evidence that [race] was a factor in [the plaintiff's] termination." *Holley*, 771 F.2d at 1166; *see also Hardin*, 45 F.3d at 264; *Rinehart*, 35 F.3d at 1267–68 (this "additional showing" that age was a factor in the termination is not an element of the usual *prima facie* case under the ADEA, only for reduction-in-force cases); *Thomure v. Phillips Furniture Co.*, 30 F.3d 1020, 1024 (8th Cir. 1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1255, 131 L.Ed.2d 135 (1995); *Bashara v. Black Hills Corp.*, 26 F.3d 820, 823 (8th Cir.1994).

In most reduction in force cases,

the evidence generally demonstrates that the company had some kind of plan to reduce expenses by eliminating jobs. These plans generally include objective criteria by which to determine which jobs will be eliminated and often include objective evidence of a business decline.

*Bashara*, 26 F.3d at 822; *see also Hardin*, 45 F.3d at 264–65 ("As we observed in *Hillebrand*, 827 F.2d at 367, most companies implementing a RIF have a stated plan to reduce expenses by eliminating jobs and they also provide company decision-makers with objective criteria by which to determine which jobs to eliminate."); *Gaworski*, 17 F.3d at 1109; *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 367. In both *Hillebrand* and *Gaworski* the Eighth Circuit Court of Appeals held that the absence of objective criteria to determine which jobs to eliminate and objective evidence of a business decline was sufficient evidence to make the additional showing that race had been a factor in the plaintiff's termination. *Hillebrand*, 827 F.2d at 368; *Gaworski*, 17 F.3d at 1109–10.

██ However, on its most recent contact with this issue in *Hardin*, the Eighth Circuit Court of Appeals concluded that "[w]hen a company's decision to reduce its workforce is due to the exercise of its business judgment it need not provide evidence of financial distress to make it a 'legitimate' RIF." *Hardin*, 45 F.3d at 265; *Bashara*, 26 F.3d at

824–25 (no requirement that a company be failing financially before embarking on a a RIF). The court went even further:

[A] company does not need to provide objective criteria for determining who should be discharged to make the RIF "legitimate." Whether criteria [are] provided does not overcome the fact that the company made a business decision to reduce its workforce and therefore had a legitimate reason for terminating qualified employees.

*Hardin*, 45 F.3d at 265. However, even though a business judgment is sufficient to make a reduction in force "legitimate" under this standard, the employee must still show "additional evidence" that age was a factor in the employee's discharge under the reduction in force. *Id.* at 265. Thus, in *Hardin*, the court approved the following formulation of the *prima facie* case of a plaintiff alleging age discrimination in the context of a RIF:

1) [the plaintiff] was at least forty years old at the time of termination; 2) [the plaintiff's] job performance met the employer's legitimate expectations; 3) [the plaintiff] was terminated despite his performance; 4) [the plaintiff's] job continued to exist in its various parts; and 5) [the plaintiff's] age was a determining factor in defendants actions.

*Id.*; *Bashara*, 26 F.3d at 823; *Nelson v. Boatmen's Bancshares, Inc.*, 26 F.3d 796, 800 (8th Cir.1994); *Holley*, 771 F.2d at 1165.

### d. Fink's prima facie case and showing of pretext

██ The court concludes that Fink has, at the least, generated a genuine issue of material fact on each element of her *prima facie* case of age discrimination in this reduction-in-force case. Plaintiff was within the protected age group at the time of her termination. Kitzman, while admitting that Fink's performance entered into her decision to terminate her instead of other employees, repeatedly asserts in her motion for summary judgment and supporting brief that she did not fire Fink for poor performance. Thus, at a minimum, there is a genuine issue of material fact that Fink was performing at a level

that met her employer's legitimate expectations. Fink was indeed terminated.

As to the fourth element, whether Fink's job continued in its various parts, defendants argue that Fink's job was entirely "gone." Plainly, this is not so. Defendants even concede as much when they agree that as the result of Fink's termination, the remaining employees would simply have had more to do. The court is not persuaded that Fink's job had to carry with it some unique duties for it to continue in its various parts after her termination. It is sufficient, the court believes, that the duties Fink previously performed, even if at the time she performed them other employees performed identical duties, still had to be done by someone after Fink's termination, either by increasing the identical workload on remaining employees, or by assigning some or all of Fink's workload as additional assignments to an employee who had not previously performed those duties.

This issue was also raised in the *Hardin* decision. In that case, the plaintiff presented evidence that other engineers were transferred into the research and development division of the company around the same time as the plaintiff was dismissed and that there were several engineers within the division who held the same job title and had virtually the same duties and responsibilities as the plaintiff. *Hardin*, 45 F.3d at 265. The court concluded that this evidence generated a genuine issue of material fact as to whether the plaintiff's job, in its various parts, continued to exist after his termination. *Id.* As in *Hardin*, the record here raises a genuine issue of material fact on whether Fink's job continued in its various parts after her termination.

Thus, the only sticking point on Fink's *prima facie* case is whether or not she has shown "additional evidence" that age was a factor in her discharge under the RIF. *Hardin*, 45 F.3d at 265. In *Hardin*, the court considered allegations strikingly similar to those offered by Fink in the present case when it considered both the question of whether the plaintiff had made an adequate showing on this additional element of the *prima facie* case in the context of a RIF, that age was a factor in the termination decision, and also in considering whether the plaintiff had made a showing of "additional facts" to rebut the employer's proffered legitimate reason for the discharge. *Hardin*, 45 F.3d at 265–66. The court found that these allegations generated material issues of fact on both the final element of the *prima facie* and on the question of whether the defendant's proffered legitimate reason was pretextual:

> [Plaintiff] first asserts that the cursory manner in which [the decision-maker] determined who to discharge suggests [the company] terminated him for an improper reason. [The decision-maker] acknowledged that he was free to terminate any two employees within his department from his lowest paid employees (custodial workers) to his highest paid employees. [The decision-maker] made his decision to fire [the plaintiff] and [another employee] after a thirty minute discussion with [his immediate subordinate]. [The decision-maker] found that [the plaintiff] and [the other employee] were the obvious persons to be terminated as "[t]hey had the poorest performance record, they were making the least contribution, they seemed to be the worst fit in the department, they had the least interpersonal skills, [and] they were not making a contribution to the department sufficiently to choose someone else."

> [The decision-maker] made these conclusions without consulting with [the plaintiff's] direct supervisor and without reviewing [the plaintiff's] or any other employee's personnel records. The only time [the decision-maker] had reviewed employee records was when he reviewed portions of [the plaintiff's] and other department employee's personnel files upon being transferred to R & D in September of 1988.

In the past, we have looked to an employer's method of determining which employees to discharge for evidence of possible discriminatory intent. *See Bashara*, 26 F.3d at 825; *Hillebrand*, 827 F.2d at 367. *See also Christie v. Foremost Ins. Co.*, 785 F.2d 584, 587 (7th Cir.1986) (the method used by the defendant might "show that the defendant was not really trying to decide which employee had greater poten-

tial"). [The decision-maker's] stated objective was to determine which two employees had the least potential and provided the least to the department. [The decision-maker's] reliance on incomplete research and his failure to even consider other employees, raises the question whether [the decision-maker] was actually trying to determine which two employees had the least potential and therefore, raises a material issue of fact whether his stated reasons for choosing Hardin are pretextual.

*Hardin,* 45 F.3d at 266.

■ In the present case, Kitzman has acknowledged that there was no directive from the board of supervisors for reducing the workforce, nor a general plan for undertaking such a reduction, only her own view that the office was overstaffed. However, under *Hardin,* Kitzman's "business judgment" that her office was overstaffed is sufficient to make a reduction in force legitimate even without evidence of financial distress or some kind of plan to reduce expenses by eliminating jobs involving objective criteria by which to determine which jobs will be eliminated and without objective evidence of a business decline.

Even if Kitzman's reduction in force was legitimate, the court finds that there is a genuine issue of material fact generated in the record concerning the fifth element of Fink's *prima facie* case, her showing that age was a determining factor, precluding summary judgment. Fink argues that Kitzman made a spur of the moment decision to terminate her in an angry reaction to Fink's taking vacation time during a busy period in the Treasurer's Office. Kitzman argues that she decided to terminate Fink on the basis of her work performance, poor attitude, complaints from persons with business in the Treasurer's Office, and her decision to take time off at the busiest time of the year. These allegations and counterallegations are similar to those raised in *Hardin.* In the present case, Kitzman retained employees with a shorter period of service and less experience with the range of tasks within the Treasurer's Office. In this case, as in *Hardin,* the court concludes that there is a genuine issue of material fact generated by the hastiness of Kitzman's discharge decision and the lack of consideration of other employees for discharge.

Kitzman's position is not enhanced by her statement that she first attempted to obtain the voluntary retirement of an employee even older than Fink. Her targeting of another, even older employee, as someone she urged to retire before terminating Fink suggests an age discriminatory animus, because in both that employee's case and in Finks, it appears from the record that Kitzman did not consider terminating younger employees with fewer years of service and less experience in the office prior to urging the one employee to retire and terminating the other. There is therefore some additional showing that age was a factor in Kitzman's decisions regarding staffing of her office and in particular in her decision to terminate Fink. Furthermore, as in *Hardin,* this same evidence generates a genuine issue of material fact that Kitzman's proffered reasons are pretextual. Defendants are therefore not entitled to summary judgment on Fink's age discrimination claim under the ADEA. The court turns next to consideration of Fink's state-law age discrimination claim.

### 2. Age Discrimination Under Iowa Law

■ In the past, the Iowa Supreme Court has applied federal principles and analytical framework to civil rights cases under Iowa Code Ch. 216. *Landals v. George A. Rolfes Co.,* 454 N.W.2d 891, 893–94 (Iowa 1990) (in the past, the Iowa Supreme Court has applied federal principles and analytical framework to civil rights cases under Iowa Code Ch. 216); *Hulme v. Barrett,* 449 N.W.2d 629, 631–33 (Iowa 1989) (civil rights cases brought under chapter 601A (now 216) will be "guided by federal law" and "federal cases"); *King v. Iowa Civil Rights Comm'n,* 334 N.W.2d 598, 601 (Iowa 1983) (same). However, the federal act does not preempt state age discrimination laws, so that the state court looks to its own act to determine if plaintiff is a protected person. *Hulme,* 449 N.W.2d at 631.

Membership in the protected class is age-neutral under Iowa Code Ch. 216, which

prohibits discrimination in employment "because of age" of an employee, with the exception that under Iowa Code § 216.6(3), persons under eighteen years of age are not covered if they are not considered by law to be adults, and under Iowa Code § 216.6(5), the employee is over forty-five years of age in an apprenticeship program. *Hulme,* 449 N.W.2d at 632.

Under Iowa's age discrimination law, Iowa Code Ch. 216, the plaintiff establishes a *prima facie* case of age discrimination if the plaintiff shows that he or she is a member of the protected age group, the plaintiff was qualified for the job he or she was performing, the plaintiff was discharged, and the plaintiff was replaced by a younger person who had comparable or lesser qualifications. *Landals,* 454 N.W.2d at 894; *Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 453 (Iowa 1989). However, as do federal courts of this circuit in a reduction-in-force case, Iowa courts recognize that

> the employee cannot rely solely on termination to establish a *prima facie* case when an employer makes cutbacks due to economic necessity. *Holley v. Sanyo Mfg., Inc.,* 771 F.2d 1161, 1165 (8th Cir.1985). Nor is it sufficient for an employee to show only that she was the victim of a cutback in the labor force necessitated by depressed economic conditions and that the job was combined into the duties of a younger employee to meet the requirements of a prima facie case. *Sahadi v. Reynolds Chemical,* 636 F.2d 1116, 1117 (6th Cir.1980). The plaintiff must come forward with additional evidence that age was a factor in her termination. *Duffy [v. Wheeling Pittsburgh Steel Corp.],* 738 F.2d [1393,] 1395 [ (3d Cir.), *cert. denied,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984) ].

*Wing v. Iowa Lutheran Hosp.,* 426 N.W.2d 175, 178 (Iowa Ct.App.1988). In *Wing,* the "additional evidence" that age was a factor in the discharge of the plaintiff despite the reduction in force was that a younger person took over the plaintiff's former responsibilities, and all of the other employees retained in her department following her departure were also younger than the plaintiff, had substantially less time on the job, and were making substantially less per hour than the plaintiff. *Id.*

In the present case, Fink is a member of the protected class under the Iowa age discrimination statute. The court also recognizes that Fink at least arguably has shown the other elements of his *prima facie* case. She was qualified for her position in the Treasurer's Office, she was discharged, and following her discharge, younger employees with less time on the job were retained.

The court therefore turns to the next stage in the analysis of Fink's state-law age discrimination claim, which, as under federal law, is consideration of the defendant's proffered reasons for the discharge and attempts of the plaintiff to rebut that reason as pretextual. The framework for that analysis under Iowa law is the same as under federal law. *Landals,* 454 N.W.2d at 893–94; *Hulme,* 449 N.W.2d at 631–33; *King,* 334 N.W.2d at 601. Suffice it to say that defendants have offered, and Fink has challenged, a legitimate, non-discriminatory reason for Fink's discharge. Fink need not show that age was defendants' sole or exclusive consideration, but must prove that age made a difference or was "a determinative factor" in the employer's decision. *Hulme,* 449 N.W.2d at 632 (citing *Smithers v. Bailar,* 629 F.2d 892, 897 (3d Cir.1980)). As with Fink's federal age discrimination claim, there is a genuine issue of material fact on these issues on her state-law age discrimination claim. Defendants are therefore not entitled to summary judgment on Fink's state-law age discrimination claim.

### B. Disability Discrimination

As with her age discrimination claim, Fink has brought her disability discrimination claims under both federal and state law. Her federal disability discrimination claim is based on the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.,* and 42 U.S.C. § 2000e as amended by the Civil Rights Act of 1991, Pub.L. 102–166, Nov. 21, 1991, 105 Stat. 1071. Her state-law disability claim is brought pursuant to Iowa Code Ch. 216. The court will consider the federal claim first, then turn to the state-law claim.

## 1. The Origins Of The ADA

The ADA provides that no employer "shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to ... the hiring, advancement or discharge of employees...." 42 U.S.C. § 12112. This language of the ADA is substantially identical to that of the Rehabilitation Act, 29 U.S.C. § 794, which forbids discrimination "by reason of his handicap." *Hedberg v. Indiana Bell Telephone Co., Inc.,* 47 F.3d 928, 932 (7th Cir.1995).

The ADA and its attendant regulations were enacted, in part, to address perceived inadequacies in the Rehabilitation Act of 1973, 29 U.S.C. § 794. *Helen L. v. DiDario,* 46 F.3d 325, 330 (3d Cir.1995) (describing in detail the history of Congressional efforts to attack disability discrimination). Congress and the Executive found that section 504 of the prior act simply was not working as a means of eradicating discrimination and segregation in this country. For example, Congress found that, even though section 504 had been the law for seventeen years,

> society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem.

42 U.S.C. § 12101(a)(2). Because Congress found further that public officials historically have been among the major perpetrators of segregated services in this country, *see* Timothy M. Cook, *The Americans With Disabilities Act: The Move To Integration,* 64 TEMP. L.REV. 393, 400, 416 (identifying state laws mandating segregation of persons with disabilities and suggesting an analogy with the

"Jim Crow laws" mandating racial discrimination), Title II of the ADA, 42 U.S.C. §§ 12131–12134, incorporates the "non-discrimination principles" of section 504 of the Rehabilitation Act, but extends them to state and local governments. *Helen L.,* 46 F.3d at 331; *Easley v. Snider,* 36 F.3d 297, 300 (3d Cir.1994).[5] Section 202 of Title II provides as follows:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132.

The ADA was not the first attempt to address the limitations of existing legislation to eradicate discrimination on the basis of disabilities. Periodically through the mid–1980s there had been attempts to amend the Civil Rights Act of 1964 to include people with disabilities. *See, e.g.,* H.R. 370, 99th Cong., 1st Sess. (1985). In 1983, the United States Commission of Civil Rights observed that "[h]andicap discrimination and, as a result, its remedies differ in important ways from other types of discrimination and their remedies," therefore disability rights laws explicitly modelled on prior civil rights statutes were not necessarily effective. U.S. COMM'N ON CIVIL RIGHTS, ACCOMMODATING THE SPECTRUM OF INDIVIDUAL ABILITIES 48, 149 (1983). A federal judge had a more blunt assessment:

> [T]he Title VI and Title IX models were not automatically adaptable to the problem of discrimination against the handicapped, but involved a very different undertaking.

---

5. These congressional findings are similar to those of Justice Stevens and Justice Marshall in their concurrences in *Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), a case involving discrimination against the mentally retarded. Justice Stevens found that "through ignorance and prejudice the mentally retarded 'have been subjected to a history of unfair and often grotesque mistreatment.'" *Cleburne,* 473 U.S. at 455, 105 S.Ct. at 3262 (Stevens, J., concurring). Similarly, Justice Marshall found that

> [a] regime of state-mandated segregation and degradation soon emerged that in its virulence

and bigotry rivaled, and indeed paralleled, the worst excesses of Jim Crow. Massive custodial institutions were built to warehouse the retarded for life; the aim was to halt reproduction of the retarded and "nearly extinguish their race." Retarded children were categorically excluded from public schools, based on the false stereotype that all were ineducable and on the purported need to protect nonretarded children from them. State laws deemed the retarded "unfit for citizenship."

*Id.* at 462–63, 105 S.Ct. at 3266–67 (Marshall, J., concurring) (footnotes omitted).

Indeed, attempting to fit the problem of discrimination against the handicapped into the model remedy for race discrimination is akin to fitting a square peg into a round hole....

*Garrity v. Gallen*, 522 F.Supp. 171, 206 (D.N.H.1981). Another commentator identified more specific weaknesses of prior laws that attempted to address disability discrimination:

Problems involved in trying to transfer principles and legal analysis developed in race and sex discrimination cases wholesale to disability discrimination were interwoven with other difficulties and shortcomings of disability nondiscrimination statutes prior to the ADA. Experience with the application of such prior statutes, including section 504 of the Rehabilitation Act of 1973, uncovered or highlighted weaknesses of such laws arising from their statutory language, the limited extent of their coverage, inadequate enforcement mechanisms, and erratic judicial interpretations. Legal commentators have extensively described and lamented the flaws in the working, interpretation, and implementation of federal disability nondiscrimination statutes prior to the ADA.

Robert L. Burgdorf, Jr., *The Americans With Disabilities Act: Analysis And Implications Of A Second–Generation Civil Rights Statute*, 26 Harv.C.R.–C.L.L.Rev. 413, 430–31 (1991) (footnotes omitted).

In enacting the ADA, Congress found that "[h]istorically, society has tended to isolate and segregate individuals with disabilities, and ... such forms of discrimination ... continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). *Helen L.*, 46 F.3d 325, 332. The purpose of the ADA in light of this history of discrimination was summarized by Congressman Dellums:

The history of different, separate, and unequal treatment of persons with disabilities, especially those with severe disabilities, could not be clearer. That history is in fact a stark reminder of the prejudice and misunderstanding that has characterized the treatment of minority citizens. This disparate treatment establishes an abundant factual predicate for the relief granted by [the ADA]. The Americans With Disabilities Act is a plenary civil rights statute designed to halt all practices that segregate persons with disabilities and those which treat them inferior [sic] or differently. By enacting the ADA, we are making a conscious decision to reverse a sad legacy of segregation and degradation.

136 Cong.Rec. H2599 (daily ed. May 22, 1990) (statement of Rep. Dellums). Almost ten years earlier, a disabled legal scholar and disability rights advocate had written that

[t]he history of society's formal methods for dealing with handicapped people can be summed up in two words: segregation and inequality. Individuals with handicapping conditions have faced an almost universal conspiracy to shunt them aside from the mainstream of society and to deny them an equal share of benefits and opportunities available to others.... At every juncture, the handicapped person has met with attempts to "push" him or her aside and to withhold that which is taken for granted from other persons.

Robert L. Burgdorf, Jr., THE LEGAL RIGHTS OF HANDICAPPED PERSONS: CASES, MATERIALS, AND TEXT 51 (1980).

Before passing the ADA, Congress conducted fourteen hearings at the Capitol, and another sixty-three field hearings, and reviewed hundreds of discrimination diaries submitted for the legislative record by persons with disabilities. AMERICANS WITH DISABILITIES ACT OF 1989: HEARINGS ON S.933 BEFORE THE SENATE COMM. ON LABOR AND HUMAN RESOURCES AND THE SUBCOMM. ON THE HANDICAPPED, 101st Cong., 1st Sess. (1989) (testimony of Justin Dar, Chairman of Task Force on Rights and Empowerment of Americans with Disabilities). Congress was confronted with testimony that

[b]y almost any definition, Americans with disabilities are uniquely underprivileged and disadvantaged. They are much poorer, much less well educated and have much less social life, have fewer amenities and have a lower level of self-satisfaction than other Americans.

SENATE SUBCOMM. ON THE HANDICAPPED, S. Hrg. 166, pt. 2, at 9 (1987) (statement of

Humphrey Taylor); quoted in S.REP. No. 116, 101st Cong., 1st Sess. 8 (1989); also quoted in H.R.REP. No. 485, 101st Cong., 2d Sess., pt. 2, at 31 (1990), 1990 U.S.Code Cong. & Admin. News 267, 313. Congress found that its hearings, investigations, and other sources revealed severe prejudice and discrimination towards disabled persons persisted in this country: Persons with disabilities, especially those with severe, noticeable disabilities, were told outright that they had been excluded because others would fee uncomfortable around them. *See, e.g.,* S.REP. No. 116, 101st Cong., 1st Sess. 7 (1989), and H.R.REP. No. 485, 101st Cong., 2d Sess., pt. 2, at 30 (1990) (a New Jersey zoo keeper refused to admit children with Down's syndrome because he feared they would upset the chimpanzees; and, from remarks of Rep. Vanik, citing as an example of discrimination on the basis of disability from *Alexander v. Choate,* 469 U.S. 287, 307 n. 29, 105 S.Ct. 712, 723 n. 29, 83 L.Ed.2d 661 (1985), a child with cerebral palsy was excluded from public school, although he was academically competitive and his condition was not actually physically disruptive, because his teacher claimed his physical appearance "produced a nauseating effect" on his classmates); 135 CONG.REC. S10720 (daily ed. Sept. 7, 1989) (statement of Sen. Durenberger) (applicant with cerebral palsy described being told she was not qualified for job in metropolitan hospital because fellow employees would not be comfortable working with her); SENATE COMM. ON LABOR AND HUMAN RESOURCES, REP. ON THE AMERICANS WITH DISABILITIES ACT, S.Rep. No. 116, 101st Cong., 1st Sess. 7 (1989) (applicant "crippled by arthritis" denied employment in higher education because "college trustees [thought] 'normal students shouldn't see her"); HOUSE COMM. ON EDUCATION AND LABOR, REP. ON THE AMERICANS WITH DISABILITIES ACT, H.R.Rep. No. 485, 101st Cong., 2d Sess., at 42, reprinted in 1990 U.S.CODE CONG. & ADMIN.NEWS 303, 324 (1990) (testimony of Virginia Domini) ("[T]he general public doesn't want to see you doing your laundry, being a case worker, a shopper, or a Mom. It is difficult to see yourself as a valuable member of society, and sometimes it is hard to see yourself as a person worthy of so much more respect than you get from the general public.").

Various draft bills to combat disability discrimination were introduced in 1988, and Congressional hearings followed. H.R. 4498, 100th Cong., 2d Sess., 134 CONG.REC. E1307 (daily ed. April 29, 1988); S. 2345, 100th Cong., 2d Sess., 134 CONG.REC. S5110 (daily ed. April 28, 1988). A revised ADA bill was introduced in the 101st Congress on May 9, 1989. S. 933, 101st Cong., 1st Sess., 135 CONG.REC. S4978 (daily ed. May 9, 1989); H.R. 2273, 101st Cong., 1st Sess., 135 CONG. REC. H1690 (daily ed. May 9, 1989). The House and Senate versions were eventually reported out of committees, the House version was passed on May 22, 1990, by a vote of 403 to 20. 136 CONG.REC. H2638 (daily ed. May 22, 1990). Following conferences on differences between the House and Senate versions, the House approved the final version of the bill by a vote of 377 to 28 on July 12, 1990, 136 CONG.REC. H4629 (daily ed. July 12, 1990), and the following day the Senate passed the ADA by a vote of 91 to 6. 136 CONG.REC. S9695 (daily ed. July 13, 1990).

In the final form of the ADA, Congress concluded that "[i]ndividuals with disabilities continually encounter various forms of discrimination...." 42 U.S.C. § 12101(a)(5). *Helen L.,* 46 F.3d 325, 332. In furtherance of the objective of eliminating discrimination against the disabled, Congress stated that "the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals." 42 U.S.C. § 12101(a)(8); *Helen L.,* 46 F.3d 325, 332. Thus, the purpose of the ADA is "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(a); *Vande Zande v. State of Wis. Dep't of Admin.,* 44 F.3d 538, 541 (7th Cir.1995). In his remarks to the more than 3000 people, most of whom had disabilities, gathered on the South Lawn of the White House for the signing ceremony, President Bush described the ADA as an "historic new civil rights Act ... [,] the world's first comprehensive declaration of equality for people with disabilities." President George Bush, Remarks by the Presi-

dent During Ceremony for the Signing of the Americans with Disabilities Act of 1990, 2 (July 26, 1990) (on file with the Harvard Civil Rights–Civil Liberties Law Review), quoted in Robert L. Burgdorf, Jr., *The Americans With Disabilities Act: Analysis And Implications Of A Second–Generation Civil Rights Statute*, 26 Harv.C.R.–C.L.L.Rev. 413 (1991). Title I of the ADA, prohibiting discrimination in employment on the basis of a disability, became effective on July 26, 1992. Pub.L. 101–336, § 108 ("This title [subchapter] shall become effective 24 months after the date of enactment [July 26, 1990].").

### 2. *Disability Discrimination Under The ADA*

■ Under the ADA, "disability" is broadly defined to include not only "a physical or mental impairment that substantially limits one or more of the major life activities of [the disabled] individual," but also "ha[ving] a record of such an impairment," or the state of "being regarded as having such an impairment." 42 U.S.C. §§ 12102(2)(A), (B), (C); *Vande Zande*, 44 F.3d at 541; *Chandler v. City of Dallas*, 2 F.3d 1385, 1391 (5th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 1386, 128 L.Ed.2d 61 (1994) ("disability" under ADA means a condition that "substantially limits" major life activity). In seeking further definition of the term "substantially limits" under the ADA, the First Circuit Court of Appeals looked to the regulations implementing the ADA:

> Those regulations indicate that the question of whether an impairment is substantially limiting turns on '(1) the nature and severity of the impairment, (2) the duration or expected duration of the impairment, and (3) the [actual or expected] permanent or long-term impact ... of, or resulting from, the impairment.' 29 C.F.R. § 1630, App. at 403 (1992).

*Cook v. State of R.I. Dep't of Mental Health, Retardation, and Hospitals*, 10 F.3d 17, 25 n. 10 (1st Cir.1993). ADA regulations, as well as ADA interpretive guidance, make clear that temporary, minor injuries do not "substantially limit" a person's major life activities. 29 CFR §§ 1630.2(j), 1630 App., at 407.

The Seventh Circuit Court of Appeals found the third prohibition, that the employer regards the employee as disabled, fits with the goals of the ADA, because "[m]any such impairments are not in fact disabling but are believed to be so, and the people having them may be denied employment or otherwise shunned as a consequence." *Vande Zande*, 44 F.3d at 541. The Fifth Circuit Court of Appeals surveyed decisions in which courts considered the issue of how limiting an employer must consider an employee's impairment to be before the employer is held to regard the employee as disabled under the Rehabilitation Act and other acts prohibiting discrimination on the basis of a disability. *Chandler*, 2 F.3d at 1391–93. The court noted that in *Forrisi v. Bowen*, 794 F.2d 931 (4th Cir.1986),

> [t]he Fourth Circuit held that the employer did not regard the employee as handicapped simply because it found that he could not meet the demands of this particular job. "The statutory reference to a substantial limitation indicates instead that an employer regards an employee as handicapped in his or her ability to work by finding the employee's impairment to foreclose generally the type of employment involved."

*Chandler*, 2 F.3d at 1392 (quoting *Forrisi*, 794 F.2d at 934). The court next observed that in *Jasany v. United States Postal Serv.*, 755 F.2d 1244, 1249–50 (6th Cir.1985), the court concluded that the employer had not regarded the employee as handicapped because his eyesight prevented his driving, because "[a]n impairment that affects only a narrow range of jobs can be regarded either as not reaching a major life activity or as not substantially limiting one." *Id.* (quoting *Jasany*, 755 F.2d at 1249 n. 3). The court then turned to one of its prior unpublished decisions in which it had that the employer's perception that the employee could work in positions other than the one he had formerly occupied despite his impairment was evidence that the employer did not regard the employee as handicapped, again emphasizing that the employee was not regarded as being substantially limited in a major life activity or in performing work-related functions in

general. *Id.* at 1392–93. From this survey, the court concluded that the rule is that

> [a]n employer's belief that an employee is unable to perform one task with an adequate safety margin does not establish per se that the employer regards the employee as having a substantial limitation on [the employee's] ability to work in general.

*Id.* at 1393.

 The ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *see White v. York Int'l Corp.,* 45 F.3d 357, 360 (10th Cir.1995) (citing this definition from the ADA); *Tyndall v. National Educ. Ctrs,* 31 F.3d 209, 212 (4th Cir.1994); *and compare School Bd. of Nassau County v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987) (similar definition in Rehabilitation Act, 29 U.S.C. § 794(a)); *Southeastern Comm. College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979) (Rehabilitation Act definition). Similarly, the ADA reaches beyond protection of people with disabilities irrelevant to performance of their jobs by defining "discrimination" as including an employer's "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless ... [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of the ... [employer's] business." *Vande Zande,* 44 F.3d at 541–42 (quoting 42 U.S.C. § 12112(b)(5)(A)). To put it another way, although the ADA prohibits discharge of a person "because of" a disability, an "employer may fire [an] employee because he cannot perform his job adequately, i.e., he is not a 'qualified individual' within the meaning of the ADA." *Hedberg,* 47 F.3d at 934 (citing 42 U.S.C. § 12111(8)). But before firing such an employee, the employer must consider whether "reasonable accommodation" can be made. *Id.; Vande Zande v. Wisconsin Dep't of Admin.,* 44 F.3d 538 (7th Cir.1995).

The Fifth Circuit Court of Appeals has formulated a two-pronged test of whether a person is "qualified" within the meaning of the ADA:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable [the individual] to perform those functions.

*Chandler,* 2 F.3d at 1393–94; *see also White,* 45 F.3d at 361–62 (quoting and applying the *Chandler* test of "qualified"); *Tyndall,* 31 F.3d at 213 (citing and applying the *Chandler* test).

There are, of course, limits upon what accommodation is required under the ADA:

> The ADA does not, for example, necessarily insulate from discharge someone whose underlying disability causes him to be frequently drunk on the job. The ADA is not a job insurance policy, but rather a congressional scheme for correcting illegitimate inequities the disabled face. *See* 42 U.S.C. § 12101(a).

*Hedberg,* 47 F.3d at 934. Under the terms of the statute, the accommodation must be "reasonable" and must not impose "undue hardship." 42 U.S.C. § 12112(b)(5)(A); *Vande Zande,* 44 F.3d at 542. In *Vande Zande,* the court considered first what was meant by "reasonable accommodation," then considered the meaning of "undue hardship":

> To "accommodate" a disability is to make some change that will enable the disabled person to work. An unrelated, inefficacious change would not be an accommodation of the disability at all. So "reasonable" may be intended to qualify (in the sense of weaken) "accommodation," in just the same way that if one requires a "reasonable effort" of someone this means less than the maximum possible effort.... It would not follow that the costs and benefits of altering a workplace to enable a disabled person to work would always have to be quantified, or even that an accommo-

dation would have to be deemed unreasonable if the cost exceeded the benefit however slightly. But, at the very least, the cost could not be disproportionate to the benefit. Even if an employer is so large or wealthy ... that it may not be able to plead "undue *hardship,*" it would not be required to expend enormous sums in order to bring about a trivial improvement in the life of a disabled employee. ...

[One could argue that] the function of the "undue hardship" safe harbor, like the "failing company" defense in antitrust liability ... is to excuse compliance by a firm that is financially distressed, even though the cost of the accommodation to the firm might be less than the benefit to disabled employees.

[However, t]his interpretation of "undue hardship" is not inevitable—in fact probably is incorrect. It is a defined term in the Americans with Disabilities Act, and the definition is "an action requiring significant difficulty or expense," 42 U.S.C. § 12111(10)(A).

*Vande Zande,* 44 F.3d at 542–43. The court therefore concluded that costs and difficulties to the employer, in light of the employer's financial health or survival, and the benefits to the employee were both relevant to the "reasonable accommodation" inquiry. *Id.*

The conclusions of the court in *Vande Zande* concerning the extent of the required accommodation are reinforced by the legislative history of the ADA itself on this point. The report of the House Committee on Education and Labor states:

The Committee wishes to make it clear that the principles enunciated by the Supreme Court in *TWA v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), are not applicable to this legislation. In *Hardison,* the Supreme Court concluded that under Title VII of the Civil Rights Act of 1964 an employer need not accommodate persons with religious beliefs if the accommodation would require more than a de minimis cost for the employer. By

contrast, under the ADA, reasonable accommodations must be provided unless they rise to the level of "requiring significant difficulty or expense" on the part of the employer, in light of the factors noted in the statute—i.e., a significantly higher standard than that articulated in *Hardison.* This higher standard is necessary in light of the crucial role that reasonable accommodation plays in ensuring meaningful employment opportunities for people with disabilities.

H.R.REP. No. 101–485, 101st Cong., 2d Sess., pt. 2, at 68 (1990), 1990 U.S.Code Cong. & Admin.News 350; *see also* H.R.REP. No. 101–485, 101st Cong., 2d Sess., pt. 3, at 40 (1990); S.REP. No. 101–116, 101st Cong., 1st Sess. 36 (1989).

### a. Analytical framework for ADA claims

To qualify for relief under the ADA, a plaintiff must establish (1) that he or she is a disabled person within the meaning of the ADA; (2) that he or she is qualified, that is, with or without reasonable accommodation (which the plaintiff must describe), he or she is able to perform the essential functions of the job; and (3) that the employer terminated the plaintiff "because of" the plaintiff's disability. *White,* 45 F.3d at 361; *Mason v. Frank,* 32 F.3d 315, 318–19 (8th Cir.1994); *Tyndall,* 31 F.3d at 212; *Chandler,* 2 F.3d at 1390; *Gilbert v. Frank,* 949 F.2d 637, 640–42 (2d Cir.1991); *Lucero v. Hart,* 915 F.2d 1367, 1371 (9th Cir.1990). The analytical framework employed by courts confronted with claims pursuant to the ADA has generally been the *McDonnell Douglas* shifting burdens analysis described above as applicable to claims under the ADEA. *See, e.g., White,* 45 F.3d at 361; *Aikens v. Banana Republic, Inc.,* 877 F.Supp. 1031, 1036–37 (S.D.Tex. 1995); *West v. Russell Corp.,* 868 F.Supp. 313, 316 (M.D.Ala.1994).[6]

### b. The prima facie case under the ADA

Although courts have applied the *McDonnell Douglas* framework with some consisten-

---

**6.** All of the cases cited below as grappling with the question of the proper *prima facie* case under the ADA also naturally assume that the *prima facie* case is part of a *McDonnell Douglas* analy-

sis. The court has only cited here cases that contain some discussion of the propriety of applying this analysis to an ADA claim.

cy, this court finds that the circuit courts of appeals have been somewhat reluctant to articulate the proper *prima facie* case for ADA claims with which to begin the analysis. In *Hedberg,* the Seventh Circuit Court of Appeals considered, without deciding,[7] the elements of a *prima facie* case under the ADA. *Hedberg,* 47 F.3d at 934, n. 5. The court confined itself to the question of what role the employer's knowledge of the plaintiff's disabilities would play in the plaintiff's *prima facie* case where those disabilities are not obvious. *Id.*

The court concluded first that where the employer did not know of the plaintiff's disabilities, the employer could not have discharged the plaintiff "because of" the disability. *Id.* at 932. The court in *Hedberg* identified a number of courts that had come to similar conclusions under the ADA or analogous statutes designed to prevent disability discrimination. *Id.; see also Landefeld v. Marion General Hosp., Inc.,* 994 F.2d 1178 (6th Cir.1993) (where employer knew nothing of handicap, employer could not be liable under the Rehabilitation Act); *Mazzarella v. United States Postal Serv.,* 849 F.Supp. 89, 96–97 (D.Mass.1994) (holding that lack of knowledge of decisionmaker who fired an employee with a mental disorder precluded liability under the Rehabilitation Act); *Grinstead v. Pool Co. of Texas,* 1994 WL 25515 (E.D.La.1994) (holding that there can be no liability under the ADA for firing a worker with a 20% disability rating when the plaintiff produced no evidence that the employer knew of the disability); *aff'd without op.,* 26 F.3d 1118 (5th Cir.1994); *McIntyre v. Kroger Co.,* 863 F.Supp. 355, 358–59 (N.D.Tex.1994) (holding that there could be no liability under Texas human rights law that forbade discharge "because of disability" for employer's discharge of mentally ill employee, where plaintiff produced no evidence that the employer knew of the disability); *Dutson v. Farmers Ins. Exchange,* 815 F.Supp. 349, 352 (D.Or.1993) (holding that where there was no evidence that an employer knew of its employee's being HIV-positive, the employer could not have illegally discriminated against the employee), *aff'd without op.,* 35 F.3d 570 (9th Cir.1994); *O'Keefe v. Niagara Mohawk Power Corp.,* 714 F.Supp. 622, 627 (N.D.N.Y. 1989) (holding that there could be no liability under New York human rights law, forbidding discharge "because of disability," where there was no genuine issue of material fact that those who decided to fire the plaintiff knew nothing of his alcoholism)

The court in *Hedberg* also concluded that

Where disabilities are not obvious, it may be that part of the plaintiff's *prima facie* case would be to demonstrate knowledge of the disability on the employer's part, as is necessary for Title VII religious discrimination. *See Beasley [v. Health Care Serv. Corp.],* 940 F.2d [1085,] 1088 [ (7th Cir. 1991) ]; *Redmond [v. GAF Corp.],* 574 F.2d [897,] 901–02 [ (7th Cir.1978) ]. All we decide today, however, is that where there is no genuine issue that an employer did not know of an employee's disability when it decided to fire him, the employee cannot make out a case of discriminatory discharge.

*Hedberg,* 47 F.3d at 933 n. 5. The court rejected that notion that an employee fired because of "symptoms" of his disability has been fired "because of" the disability where those "symptoms" may have any number of sources other than disability, remarking that "[t]he ADA does not require clairvoyance." *Id.* at 943. Only if the employer knows of the disability, or if the "symptoms are so obviously manifestations of an underlying disability that it would be reasonable to infer that an employer actually knew of the disability," do the provisions of the ADA become binding. *Id.* Similarly, where the disability discrimination plaintiff fails to establish that he or she was treated differently from other persons, the plaintiff has failed to establish one element of a *prima facie* disability discrimination case, and no further inquiry is needed. *Owens v. United States Postal Serv.,* 37 F.3d 1326, 1328 (8th Cir. 1994).

However, finding themselves in the quandary of being left without precise guidance from the circuit courts of appeals articulating

---

7. The court stated, "We need not decide the precise elements of a *prima facie* case of discrimination under the ADA." *Hedberg,* 47 F.3d at 934, n. 10.

the proper *prima facie* case for an ADA plaintiff, the district courts have hit upon two possible formulations, as demonstrated by a sampling of recent ADA decisions. In one group are those courts that apply a *prima facie* case that is indistinguishable from the elements of an ADA case as described above: a plaintiff must establish (1) that he or she is a disabled person within the meaning of the ADA; (2) that he or she is qualified, that is, with or without reasonable accommodation (which the plaintiff must describe), he or she is able to perform the essential functions of the job; and (3) that the employer terminated the plaintiff "because of" the plaintiff's disability. *See, e.g., Ricks v. Xerox Corp.,* 877 F.Supp. 1468 (D.Kan.1995); *Howe v. Hull,* 873 F.Supp. 72, 78 (N.D.Ohio 1994). In another group are those courts applying a *prima facie* case more obviously adapted from the one used in other employment discrimination cases: the plaintiff must establish (1) that he or she is disabled within the meaning of the ADA; (2) he or she is a "qualified individual" within the meaning of the ADA; (3) the plaintiff was subject to an adverse employment decision; and (4) the plaintiff was replaced by a non-disabled person or was treated less favorably than non-disabled employees. *See, e.g., Zambelli v. Historic Landmarks, Inc.,* 1995 WL 116669 (E.D.Pa.1995); *Aikens v. Banana Republic, Inc.,* 877 F.Supp. 1031, 1036–37 (S.D.Tex. 1995); *Rogers v. International Marine Terminals, Inc.,* 1995 WL 16787, *3 (E.D.La. 1995); *Aucutt v. Six Flags Over Mid-America, Inc.,* 869 F.Supp. 736 (E.D.Mo.1994); *Stradley v. Lafourche Communications, Inc.,* 869 F.Supp. 442, 443 (E.D.La.1994); *West v. Russell Corp.,* 868 F.Supp. 313, 317 (M.D.Ala.1994).[8] Other courts, without deciding the precise formulation of the *prima facie* case have held that failure to make some specific showing meant that the plaintiff could not establish a *prima facie* case. *See, e.g., Jeanine B. v. Thompson,* 877 F.Supp. 1268 (E.D.Wis.1995) (failure to allege that plaintiffs were disabled persons was fatal to *prima facie* case under ADA and Rehabilitation Act); *Garcia–Paz v. Swift*

*Textiles, Inc.,* 873 F.Supp. 547, 554 (D.Kan. 1995) (although defendant asserted plaintiff could not show any of the elements of a typical discrimination claim, the court found plaintiff had failed to establish a *prima facie* case because the plaintiff could not show that she was a "qualified individual with a disability").

■ This court agrees with those decisions holding that the proper *prima facie* case under the ADA is that most closely resembling the *prima facie* showing required for other forms of employment discrimination: the plaintiff need not show at the *prima facie* case phase that he or she was terminated "because of" a disability. Rather, the plaintiff need only make a showing that gives rise to an *inference* of discrimination on the basis of disability. Hence, the plaintiff must show that he or she suffered an adverse employment decision, and that plaintiff was replaced by a non-disabled person, one with a lesser disability, or one whose disability is more easily accommodated, or the plaintiff was treated less favorably than non-disabled employees, those with lesser disabilities, or those whose disabilities are more easily accommodated.

The court admits that no other authority has included in its formulation of the *prima facie* case under the ADA the comparison of the plaintiff with persons with lesser or more easily accommodated disabilities. However, the court does not believe that the protections of the ADA come into play only if the disabled plaintiff was replaced by or treated less favorably than a *non*-disabled person, just as in an ADEA case, it is not necessary that the plaintiff be replaced with a person from outside the protected class, only that the plaintiff be replaced by a *younger* person. *Rinehart,* 35 F.3d at 1265–66. A plaintiff has been terminated "because of" his or her disability just as surely where the employer terminates the plaintiff in favor of another who also fits within the ADA's definition of "disable," but whose disability is more cheaply or easily accommodated, as when the plaintiff is terminated in favor of an

---

8. Courts using both formulations of the *prima facie* case cite *White,* 45 F.3d at 361, as supporting their formulation of the test, which is indicative of the uncertainty created by the silence of the circuit courts of appeals on this issue.

non-disabled person. If the ADA permitted such substitution of persons with less severe or more easily accommodated disabilities for those with more severe or less easily accommodated ones, it would be creating a scenario wherein employers were permitted to discriminate among members of the ostensibly protected class. The ADA's requirement that accommodation be reasonable already provides sufficient protection to employers from "undue hardship," but preserves the outer limits in defining the class of disabled persons, rather than allowing employers to control whom the ADA protects.

One court, confronted as is this court with an ADA claim in a reduction-in-force context, found that the modifications in the *prima facie* case for such a scenario, discussed extensively above in reference to Fink's ADEA claim, were also applicable to an ADA claim. *Aucutt,* 869 F.Supp. at 743. Thus, for an ADA claim in a reduction-in-force case, the court applied a *prima facie* case with the additional requirement that the plaintiff make an "additional showing" that his disability was a "determining factor" in the decision to choose him for layoff. *Id.* Although this court believes that such a modification to the *prima facie* case under the ADA in the context of a reduction in force may be appropriate, the court finds that it need not decide on the exact elements of the *prima facie* case here, because, under any formulation, Fink has failed to generate a genuine issue of material fact that she can meet the threshold element of her ADA claim.

### c. Fink's prima facie case

Fink argues that she was "disabled" within the meaning of the ADA because she suffered from carpal tunnel syndrome, had a record of that affliction, and, further, was regarded by Kitzman as being disabled. The court has unearthed only a few cases in which a plaintiff based a claim of disability discrimination under the ADA upon affliction with carpal tunnel syndrome. Some of these cases are not of assistance on the issues before the court here. *Lintemuth v. Saturn Corporation,* 1994 WL 760811 (M.D.Tenn. filed Aug. 29, 1994) (plaintiffs with various afflictions, including some with carpal tunnel syndrome, would have required case-by-case adjudication, and therefore could not adequately represent a class); *Ross v. Boeing Co.,* 1994 WL 324570 (D.Kan. filed June 7, 1994) (ADA was not retroactive, and there was no evidence of a continuing pattern of discrimination, thus plaintiff alleging disability discrimination on the basis of carpal tunnel syndrome and herniated disks in August of 1988 had no cognizable claim under the ADA); *Block v. Art Iron, Inc.,* 866 F.Supp. 380 (N.D.Ind.1994) (plaintiff did not work for twelve months after developing carpal tunnel syndrome and was terminated, but decision considered only whether plaintiff had complied with an arbitration clause in his employment contract).

Of more interest are two other decisions. In *McKay v. Toyota Motor Mfg., U.S.A., Inc.,* 878 F.Supp. 1012 (E.D.Ky.1995), the court considered whether the plaintiff, who had been evaluated as having a 10% disability of her right arm and a 6% permanent impairment to her body as a whole as the result of carpal tunnel syndrome was "disabled" within the meaning of the ADA. *McKay,* 878 F.Supp. at 1015. The court concluded first that the plaintiff was not substantially limited in the major life activity of working, nor was she a person who would be considered to have a disability, because her carpal tunnel syndrome did not restrict her overall employment opportunities even though it did restrict her from performing repetitive factory work. *Id.* Nor was she restricted in the major life activity of caring for herself on the basis that she was restricted in some housekeeping activities such as mopping. *Id.* Furthermore, the court found that the plaintiff had produced no record of having been regarded as having an impairment, because the plaintiff produced no evidence that her employer ever regarded her as being disabled. *Id.* at 1016. Finally, the court rejected the plaintiff's argument that individuals suffering from carpal tunnel injury are considered disabled under the ADA as a matter of law. *Id.* The plaintiff asserted that the case of *Hunter v. Nash Finch Co.,* 498 N.W.2d 759, 762 (Minn.1993) so held. *Id.* However, the court noted that the cited case involved the Minnesota Human Rights

Act, and, further, that the court in *Hunter* specifically stated that "[the plaintiff's] claim of discrimination [was] not based on carpal tunnel injury to his right hand." *Id.* Nor, the court held, was a mere diagnosis of carpel tunnel syndrome sufficient to raise a genuine issue of material fact. *Id.* The court therefore granted summary judgment in favor of the employer on the employee's ADA claim. *Id.*

In an unpublished opinion, another court concluded that a plaintiff who could no longer use a keyboard at all as the result of carpal tunnel injury no longer was a "qualified individual" because use of the keyboard was and "essential function" of his job. *Feliberty v. Kemper Corp.*, 1995 WL 35398, *3–4 (N.D.Ill. filed Jan. 27, 1995). The court therefore granted summary judgment in favor of the employer on the employee's ADA claim. *Id.* at *5.

 In the present case, the court finds that Fink cannot meet the first element of her *prima facie* case, whichever formulation is used, because she cannot demonstrate a genuine issue of material fact that she is disabled within the meaning of the ADA. The record suggests, at most, that Fink had a lifting restriction as the result of her carpal tunnel syndrome, but that she was not limited in any other way. The record does not demonstrate a genuine issue of fact that the lifting restriction substantially limited any major activity, or even that it impaired Fink's job performance. The record also demonstrates that Fink was able to, and did, perform all of the essential functions of her employment without any accommodation. Nor has Fink presented any evidence that the lifting restriction restricted any particular function of her present job or restricted her overall employment opportunities. Fink's evidence that her employer regarded her as being impaired is also insufficient to generate a genuine issue of material fact on the question. At most, Fink has shown that Kitzman was aware that Fink had carpal tunnel syndrome, and had missed work for surgery to improve that condition. After her return to work, Fink asserts that she was compelled to work overtime to make up for missed work, but this does not indicate that

Kitzman considered her disabled; if anything, it indicates that Kitzman did not consider that Fink's condition prevented her from performing any of the essential functions of her job.

Furthermore, the court finds that consideration of the regulations promulgated under the ADA show that Fink has failed to generate a genuine issue of material fact that she is disabled within the meaning of the Act. *See* 29 C.F.R. § 1630. The nature and severity of her condition are, according to her own evidence, slight. She has offered no evidence whatsoever as to whether her condition can be expected to improve, continue, or deteriorate, and also has failed to present any evidence that her condition will have any actual or expected long-term impact on her life or employment prospects. In these circumstances, the court concludes that defendants are entitled to summary judgment on Fink's disability discrimination claim under the ADA for failure to establish a *prima facie* case.

The court is by no means saying that carpal tunnel syndrome cannot be the basis for a protected disability under the ADA. The court has no doubt that there are people sufficiently impaired by carpal tunnel syndrome to qualify as "disabled" persons under the ADA, and would, on a proper factual showing, find that the ADA provided them with protection from discrimination on the basis of their disability. However, such a factual showing has not been made in this case.

### 2. *Elements Of A Disability Discrimination Claim Under Iowa Law*

 Fink has also alleged disability discrimination in violation of Iowa Code Ch. 216. Iowa Code § 216.6 (formerly § 601A.6) makes it an unfair or discriminatory employment practice to discharge any employee "because of" a disability "unless based upon the nature of the occupation." Iowa Code § 216.6; *Sierra v. Employment Appeal Bd.*, 508 N.W.2d 719, 722 (Iowa 1993). The elements of a case of disability discrimination under Iowa law are that the plaintiff must prove that he or she (1) has a disability; (2) was qualified for the position; and (3) was

discharged because of his or her disability. *Boelman v. Manson State Bank,* 522 N.W.2d 73, 79 (Iowa 1994). Thus, the *prima facie* case the plaintiff must present is as follows:

(1) that the employee belongs to a protected group; (2) that the employee was qualified to retain the job; (3) the employee was terminated; and (4) it is more likely than not that the termination was based on an impermissible consideration.

*Miller v. Sioux Gateway Fire Dep't,* 497 N.W.2d 838, 840 (Iowa 1993) (citing *Hamer, infra* ); *Henkel Corp. v. Iowa Civil Rights Comm'n,* 471 N.W.2d 806, 809 (Iowa 1991); *Hamer v. Iowa Civil Rights Comm'n,* 472 N.W.2d 259, 264 (Iowa 1991). If the plaintiff establishes a *prima facie* case by the preponderance of the evidence, the burden then shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, non-discriminatory reason for its actions. *Smith v. ADM Feed Corp.,* 456 N.W.2d 378, 385 (Iowa 1990).[9] The court finds that in the present case, Fink has failed to generate a genuine issue of material fact that she had a protected disability under Iowa law at the time of her termination, just as she failed to meet this requirement for her federal disability discrimination claim.

### a. Protected disability

 The threshold inquiry is whether the plaintiff can show that he or she is a disabled person subject to protection under Iowa Code § 216.6. *Miller,* 497 N.W.2d at 841; *Henkel Corp.,* 471 N.W.2d at 809; *Mon-*

*son v. Iowa Civil Rights Comm'n,* 467 N.W.2d 230, 232–33 (Iowa 1991). Under Iowa law, a handicapped or disabled person is defined as "any person who has a physical or mental impairment which substantially limits one or more of such person's major life activities, has a record of such impairment, or is regarded as having such impairment." *Miller,* 497 N.W.2d at 841; *Henkel,* 471 N.W.2d at 810; *Probasco v. Iowa Civil Rights Comm'n,* 420 N.W.2d 432, 434 (Iowa 1988). Although the impairment must significantly decrease the plaintiff's ability to obtain satisfactory employment otherwise, *Henkel,* 471 N.W.2d at 810; *Probasco,* 420 N.W.2d at 436, the plaintiff need not be "almost unemployable because of [the plaintiff's] impairment to be considered disabled." *Henkel,* 471 N.W.2d at 810. Rather, the plaintiff's disability must limit one or more of the plaintiff's "major life activities," which have been defined in 161 Iowa Admin.Code § 8.26(3) as including "caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Henkel,* 471 N.W.2d at 810; *Monson,* 467 N.W.2d at 233; 161 Iowa Admin.Code § 8.26(3). Additionally, the impairment must "disqualif[y] [the employee] from a wide range of other available jobs." *Hollinrake v. Law Enforcement Academy,* 452 N.W.2d 598, 604 (Iowa 1990).

### b. Fink's disability

 For the same reasons Fink was not "disabled" within the meaning of the ADA,

---

9. Thus, under Iowa law, there is no uncertainty about the application of a burden-shifting analysis or about the elements of the *prima facie* case as there was with Fink's ADA claim.

Another distinction between claims of disability discrimination based on the ADA and those based on Iowa law exists on the meaning of reasonable accommodation under each act. The Iowa Supreme Court embraced the standard for accommodation of disabilities articulated by the United States Supreme Court in *TWA v. Hardison,* 432 U.S. 63, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977), which was specifically rejected in the legislative history of the ADA. *Cerro Gordo County Care Facility v. Iowa Civil Rights Comm'n,* 401 N.W.2d 192, 197 (Iowa 1987) ("we require a reasonable effort by the employer in carrying out [accommodation of an employee's disability]," but citing *Hardison,* the employer is not required "to bear more than a de minimis cost" in its obligation to accommodate the em-

ployee); *Frank v. American Freight Sys., Inc.,* 398 N.W.2d 797, 802–03 (Iowa 1987) (truck driver's employer was "justified in looking ahead to the situation, which the medical evidence shows to be probable, in which [the plaintiff] will not be able to do the job. In that situation, other employees would be required to fill in for him. [The plaintiff's] team driver might be required to do all of the heavy work, including the loading and lifting. To hold, as the district court did, that this would be reasonable accommodation, we believe was erroneous," citing *Hardison* for the standard for "reasonable accommodation"). The rejection of the *Hardison* standard under the ADA was discussed above at page 40. The Iowa Supreme Court has not repudiated this standard for reasonable accommodation under Iowa law since the passage of the ADA. However, this court does not reach the issue of reasonable accommodation under either the ADA or the Iowa Civil Rights Act in the present case.

she is not "disabled" within the meaning of Iowa Code Ch. 216. Fink has failed to generate a genuine issue of material fact that her carpal tunnel injury substantially limited any major activity, or even that it impaired Fink's job performance. Furthermore, nothing in the record raises a genuine issue of material fact that Fink is disqualified from a wide range of other available jobs. Defendants are entitled to summary judgment on Fink's claim of disability discrimination brought pursuant to Iowa Code Ch. 216.

### C. Retaliation For Filing A Workers Compensation Claim

Fink's third claim is that she was discharged in violation of public policy for filing a workers compensation claim. Defendants argue that there is no evidence that Fink was discharged for filing a workers compensation claim. They assert that when Kitzman terminated Fink, although she knew Fink had filed a workers compensation claim alleging that her carpal tunnel syndrome was work-related, Kitzman understood that Fink's claim had been denied. Defendants assert that Fink was terminated only for the reasons Fink gave, none of which violate public policy. Fink, on the other hand, asserts that she was told directly by Kitzman not to file a workers compensation claim or to try to get money from the county for her carpal tunnel affliction.

#### 1. Recognition Of The Public Policy Exception Under Iowa Law

The Iowa Supreme Court was slow to recognize a cause of action for the wrongful discharge of an at-will employee, instead relying on the general rule that an at-will employee may be terminated at any time, for any reason. *See Abrisz v. Pulley Freight Lines, Inc.,* 270 N.W.2d 454, 455 (Iowa 1978); *Harper v. Cedar Rapids Television Co., Inc.,* 244 N.W.2d 782, 791 (Iowa 1976); *Allen v. Highway Equip. Co.,* 239 N.W.2d 135, 139 (Iowa 1976). In *Northrup v. Farmland Indus., Inc.,* 372 N.W.2d 193 (Iowa 1985), the court stated that

> [t]his court has never expressly recognized a public policy exception [to the employment at will doctrine], although we recent-

ly noted its increasing acceptance in other jurisdictions. [Citations omitted].

While we hinted in *Abrisz* that, under proper circumstances, we would recognize a common-law claim for a discharge violating public policy, we did not apply it there because the facts did not establish such a violation. We observed, moreover, that "[c]ourts should not declare conduct violative of public policy unless it is clearly so." *Abrisz,* 270 N.W.2d at 456. It has been observed, in fact, that successful common-law claims for wrongful discharge have been based in large part on violations of independent statutory policy, not those established by court decisions. *See* Note, *Protecting At–Will Employees [Against Wrongful Discharge: The Duty to Terminate Only in Good Faith],* 93 Harv.L.Rev. at 1822–23.

*Northrup v. Farmland Indus., Inc.,* 372 N.W.2d 193, 196 (Iowa 1985). The court then went on to find an express public policy prohibiting discharges for "disabilities," but held that a claim of wrongful discharge based on a disability was preempted by the exclusive remedies of Iowa Code Ch. 601A (now Iowa Code Ch. 216). *Id.* As in *Abrisz,* the court again refused to recognize a claim of wrongful discharge in violation of public policy in *Haldeman v. Total Petroleum, Inc.,* 376 N.W.2d 98 (Iowa 1985), because "we simply observe that this case would not fall into such an exception." 376 N.W.2d at 105. In *Haldeman,* the plaintiff's claim of wrongful discharge was based on her discharge as a cashier following discovery of "unexplained shortages." *Id.* In *Cross v. Lightolier Inc.,* 395 N.W.2d 844 (Iowa 1986), the Iowa Supreme Court recognized that jurisdictions were split on whether an action for wrongful discharge under a mandate of public policy is a contract or tort action. 395 N.W.2d at 849. However, the court upheld the trial court's conclusion that plaintiff's claim of breach of an oral contract was a contract and not a tort claim, and reiterated that "[e]mployment at will ... cannot be used as a basis for an action for wrongful discharge or breach of employment contract." *Id.* (quoting *Haldeman,* 376 N.W.2d at 105).

It was not until 1988 that the Iowa Supreme Court recognized a cause of action for discharge that frustrates a well-recognized and defined public policy of the state in the case of *Springer v. Weeks & Leo Co., Inc.*, 429 N.W.2d 558, 560 (Iowa 1988) (hereinafter *Springer I*).[10] However, the court considered the cause of action to be one of tortious interference with a contract of hire. *Springer I*, 429 N.W.2d at 560. The court later concluded that this characterization "may have been misleading," and cited cases clarifying the court's development and refinement of the tort. *Springer v. Weeks & Leo Co., Inc.*, 475 N.W.2d 630, 632–33 (Iowa 1991) (hereinafter *Springer II*). The court has construed *Springer I* as holding that if the discharge of an employee at will is in violation of public policy, the employee has a cause of action in tort against the employer. *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 685 (Iowa 1990). *See also Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 637 (Iowa 1990) (in *Springer I*, "the court recognized an at-will employee's right to compensation for wrongful discharge in violation of a 'clearly articulated public policy of this state'"); *Fogel v. Trustees of Iowa College*, 446 N.W.2d 451, 455 (Iowa 1989) (citing *Springer I* for the same proposition).

■ As the law now stands in Iowa, the general rule is still that an at-will employee may be discharged at any time, for any reason, or no reason at all. *Borschel v. City of Perry*, 512 N.W.2d 565, 566 (Iowa 1994); *Lara v. Thomas*, 512 N.W.2d 777, 781 (Iowa 1994); *French v. Foods, Inc.*, 495 N.W.2d 768, 769 (Iowa 1993); *Grahek v. Voluntary Hosp. Co-op. Ass'n of Iowa, Inc.*, 473 N.W.2d 31, 34 (Iowa 1991); *Fogel*, 446 N.W.2d at 455. The court has recognized two exceptions to this general rule in which a cause of action for wrongful discharge of an at-will employee will lie: The first is where the discharge is in clear violation of a "well-recognized and defined public policy of this state," and the second is where a contract is created by an employer's handbook or policy manual. *Borschel*, 512 N.W.2d at 566; *French*, 495 N.W.2d at 769–70; *Fogel*, 446

N.W.2d at 455. *See also Lara*, 512 N.W.2d at 782 (case involved "one of the exceptions," discharge in violation of public policy); *Grahek*, 473 N.W.2d at 34 ("termination of an employment at-will is generally not actionable in the absence of discrimination or a public policy violation."); *Vaughn*, 459 N.W.2d at 638 (public policy exception only discussed); *Niblo v. Parr Mfg., Inc.*, 445 N.W.2d 351, 355 (Iowa 1989) (public policy exception only discussed). The public policy exception is based on the theory that the law should not allow employees to be fired for reasons that violate public policy. *Borschel*, 512 N.W.2d at 567 (citing 82 Am.Jr.2d, *Wrongful Discharge* § 15, at 687 (1992)).

■ Under the public policy exception, the Iowa Supreme Court has recognized causes of action for tortious discharge where an employer's retaliatory discharge would conflict with certain legislatively declared goals. *Lara*, 512 N.W.2d at 782. Such policies may be expressed in the constitution and the statutes of the state, *Borschel*, 512 N.W.2d at 567 (citing 82 Am.Jr.2d, *Wrongful Discharge* § 19, at 692 (1992)), although enforcement of the tort based on some policies is preempted by enforcement under the statutes embodying those policies themselves:

> The legislature may explicitly prohibit the discharge of an employee who acts in accordance with a statutory right or duty. *See, e.g.*, Iowa Code ch. 216 (1993) (civil rights statute transferred from Iowa Code ch. 601A). Discharge of an employee because of age, race, creed, color, sex, national origin, religion, or disability is an unfair employment practice. Iowa Code § 216.6. Remedies are provided employees who are discharged in violation of the statute. *See* Iowa Code § 216.15. Our civil rights statute, however, preempts an employee's claim that the discharge was in violation of public policy when the claim is premised on discriminatory acts. *Hamilton v. First Baptist Elderly Hous. Found.*, 436 N.W.2d 336, 341–42 (Iowa 1989).

*Borschel*, 512 N.W.2d at 567–68. The *Borschel* court then identified the circumstances

---

**10.** The opinion in *Springer I* cites no fewer than thirteen other states that had judicially recognized the public policy exception to employment at will:

in which Iowa courts had found a public policy basis for the tort:

> In the absence of an express prohibition, the court of appeals found an implied cause of action for wrongful termination when the reason for discharge is the employee's failure or refusal to violate a law in the course of employment. *Wilcox v. Hy–Vee Food Stores, Inc.,* 458 N.W.2d 870, 872 (Iowa App.1990). The court of appeals found that the violation of a statute prohibiting an employer from requiring an employee to take a polygraph examination was a violation of public policy, thus a private cause of action existed. *Id.* at 872. At the time the claim arose the statute did not expressly allow for a cause of action. This statute was later amended to so provide. *Id.*

> Also we have found an implied prohibition against retaliatory discharge based on an employee's exercise of a right conferred by a clearly articulated legislative enactment. *See Lara v. Thomas,* 512 N.W.2d 777, 780 (Iowa 1994) (discharge in retaliation for filing partial unemployment claim); *Niblo v. Parr Mfg., Inc.,* 445 N.W.2d 351, 353 (Iowa 1989) (employee discharged because she threatened to file a workers' compensation claim); *Springer [I],* 429 N.W.2d at 560 (cause of action exists when the employee's discharge serves to frustrate the public policy expressed in the workers' compensation statute).

*Borschel,* 512 N.W.2d at 568. A wrongful or retaliatory discharge in violation of public policy is therefore an intentional wrong committed by the employer against an employee who chooses to exercise some substantial right. *Niblo,* 445 N.W.2d at 355 (citing *Perks v. Firestone Tire & Rubber Co.,* 611 F.2d 1363, 1366 (3d Cir.1979)). The remedy for the tort should be for the employee's complete injury, including out-of-pocket loss of income and causally connected emotional harm. *Id.*

#### 2. *Discharge For Filing A Workers Compensation Claim*

The case in which the Iowa Supreme Court first recognized a public policy exception to the at-will employment doctrine was in fact a case in which the plaintiff claimed to have been discharged for filing a workers compensation claim. *Springer I,* 429 N.W.2d at 560. In a more thorough discussion of the evidence necessary to support a claim based on filing of a workers compensation claim, the Iowa Supreme Court held that a jury could deduce that the plaintiff was fired for filing a workers compensation claim where the representative of the company told the employee that he was not going to pay workers compensation benefits for a skin condition allegedly that was allegedly work-related, that he did not believe that the employee's skin problem was his fault or "factory related," and that he was not going to pay to have the employee's face worked on at all, and, at the conclusion of this outburst, the representative fired the employee. *Niblo,* 445 N.W.2d at 353. In *Springer II,* the Iowa Supreme Court identified the elements of the public policy exception claim when based upon discharge in retaliation for filing a workers compensation claim as follows:

> Plaintiff must prove all of the following propositions:
>
> 1. Plaintiff was an employee of defendant.
>
> 2. Defendant discharged plaintiff from employment.
>
> 3. Defendant discharged plaintiff because she filed a workers compensation claim.
>
> 4. The discharge was a proximate cause of damage to the plaintiff.
>
> 5. The nature and extent of the damage.
>
> If the plaintiff has failed to prove any of these propositions, the plaintiff is not entitled to damages. If the plaintiff has proven all of these propositions, then the plaintiff is entitled to damages.

*Springer II,* 475 N.W.2d at 633 (citing Iowa Civil Jury Instruction 3100.1). The court recognized further that a growing number of courts and legislatures have recognized a public policy exception to an employer's right to discharge an at-will employee for asserting statutory workers compensation rights. *Id.* (citing Annotation, *Recovery for Discharge from Employment in Retaliation for Filing Workers' Compensation Claim,* 32 A.L.R.4th 1221 (1984); Note, *Employment at Will in Iowa: Is it the Rule or the Exception?,* 39 Drake L.Rev. 157, 160 (1989–90)).

In the present case, the court concludes that there is a genuine issue of material fact on some of the elements of Fink's retaliation claim. Defendants concede that Fink can demonstrate the first two elements, employment and discharge. They argue, however, that she cannot show the third element, discharge because she filed a workers compensation claim. The court does not agree. Fink has produced sufficient evidence to preclude summary judgment that Kitzman threatened her not to file a workers compensation claim, told her the county would not pay for her treatment, and told her she doubted that Fink's condition was work-related. These statements roughly parallel those found sufficient for a jury to conclude that the plaintiff had been fired for filing a workers compensation claim in *Niblo*. The defendants have succeeded in creating a controversy as to whether Kitzman or anyone else expressed antagonism towards Kitzman for filing a workers compensation claim, but have failed to prove that Kitzman did not make such statements. A genuine issue of material fact therefore exists precluding summary judgment against Fink on her retaliation claim.

### D. Intentional Interference With Employment Contract

Fink's next claim is that Kitzman intentionally interfered with her employment contract with the County. Leaving aside, for the moment, the question of whether or not Fink even had a contract governing her employment relationship with the County, the court finds that Kitzman could not have interfered with such a relationship as the tort is formulated under Iowa law.

#### 1. Interference With A Contract

The Iowa formulation of the tort of intentional interference with performance of a contract by a third person is based on the Restatement (Second) of Torts § 766 (1977):

One [Kitzman] who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another [Fink] and a third person [Grundy County] by inducing or otherwise causing the third person [Grundy County] not to perform the contract, is subject to liability to the other [Fink] for pecuniary loss resulting to the other [Fink] from the failure of the third person [Grundy County] to perform the contract.

*Grahek v. Voluntary Hosp. Co-op.*, 473 N.W.2d 31, 35 (Iowa 1991); *Reihmann v. Foerstner*, 375 N.W.2d 677, 683 (Iowa 1985); Iowa Civil Jury Instruction 1200.1. Thus, the plaintiff must show (1) the plaintiff had a valid contract, (2) the defendant knew of the contract, (3) the defendant intentionally and improperly interfered with the contract, (4) the interference caused the contracting parties not to perform the contract with the plaintiff, and (5) the amount of the plaintiff's damages. *Water Dev. Co. v. Board of Water Works*, 488 N.W.2d 158, 161 (Iowa 1992) (citing *Nesler v. Fisher & Co., Inc.*, 452 N.W.2d 191, 194 (Iowa 1990)); *See also* Iowa Civil Jury Instruction 1200.1.

This tort is not committed by parties to the contract; the tortfeasor must interfere with a contract between another and a third person. *Grahek, supra,* at 35. The tort plainly requires that a third party, who is a party to the underlying contract, be induced or caused to act by the alleged tortfeasor, who must be a stranger to the contract. *Id.* In the present case, Fink has alleged that Kitzman, the Grundy County Treasurer and her superior in her employment with the County Treasurer's Office, interfered with Fink's employment with the County. However, under state law, only the county treasurer can hire or fire employees in the Treasurer's Office. Therefore Kitzman, as the representative of the County controlling Fink's employment with the county, could not interfere with a contract between Fink and the County. Fink therefore cannot pursue a claim of tortious interference with a contract.

#### 2. Interference With Business Advantages Or Relations

Unlike tortious interference with a contract, the tort of interference with business relations or advantages does not require a showing that a contract existed between the plaintiff and another. *Toney v. Casey's General Stores, Inc.*, 372 N.W.2d 220, 222

(Iowa 1985); *Clark v. Figge,* 181 N.W.2d 211, 213 (Iowa 1970).[11] However, this tort is also premised on the acts of a stranger to the relationship in interfering with relations between the plaintiff and another, as is shown by the elements of the tort:

1. The plaintiff had a prospective [contract or business relationship] with a [third person].

2. The defendant knew of the prospective relationship.

3. The defendant intentionally and improperly interfered with the relationship by [set forth the particulars supported by the evidence].

4. a. The interference caused [the third person] not [to enter into or continue] the relationship [or]

 b. The interference prevented the plaintiff from [entering or continuing] the relationship.

5. The amount of damage.

Iowa Civil Jury Instructions, 1200.2; *see generally, Nesler v. Fisher & Co., Inc.,* 452 N.W.2d 191, 199 (Iowa 1990); *Gordon v. Noel,* 356 N.W.2d 559, 563 (Iowa 1984); *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 799 (Iowa 1984). Kitzman could no more interfere with a business relationship between Fink and the County, for whom Kitzman acted, than she could interfere with a contract between Fink and the County, because she was a party or agent of a party involved in the relationship, not a stranger to the relationship. Defendants are entitled to summary judgment on Fink's claim of tortious interference with a contractual or business relationship and that claim must be dismissed.[12]

### E. Breach Of Covenant Of Good Faith And Fair Dealing

■ There is some overlap among Fink's state-law claims of implied covenants or contracts establishing a good cause requirement for her termination. Counts V, VI, and VII each assert that the defendants' termination of her employment runs afoul of an implied obligation not to do so except for good cause. Fink's state-law claims of breach of covenant of good faith and fair dealing, on the basis that such a covenant was implied-in-fact (Count V), or implied-in-law (Count VI), may be disposed of briefly. Defendants correctly state that the Iowa Supreme Court has never recognized such a cause of action in an employment context. *Porter v. Pioneer Hi-Bred Int'l., Inc.,* 497 N.W.2d 870, 871 (Iowa 1993); *French v. Foods, Inc.,* 495 N.W.2d 768, 771 (Iowa 1993); *Grahek v. Voluntary Hosp. Coop. Ass'n Of Iowa, Inc.,* 473 N.W.2d 31, 34 (Iowa 1991); *Fogel v. Trustees of Iowa College,* 446 N.W.2d 451, 456–57 (Iowa 1989). In *Fogel,* the court found that

---

**11.** A more essential distinction, in most cases, between this tort and the tort of interference with contractual relations is that for the tort of interference with business relations or advantages, the tortfeasor must be shown to have had as a purpose for the interference "to financially injure or destroy the plaintiff" while no such showing of intent is necessary for the tort of interference with a contract. *Burke v. Hawkeye Nat'l Life Ins. Co.,* 474 N.W.2d 110, 114 (Iowa 1991); *Nesler v. Fisher & Co., Inc.,* 452 N.W.2d 191, 199 (Iowa 1990); *Page County Appliance Center, Inc. v. Honeywell, Inc.,* 347 N.W.2d 171, 177 (Iowa 1984); *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 799 (Iowa 1984); *First Medical, Inc. v. Embassy Manor Care Ctr., Inc.,* 483 N.W.2d 14, 16 (Iowa App.1992). Were Fink's claim otherwise viable, the court notes that Fink has only suggested that it was Kitzman's intention to interfere with her employment.

**12.** Defendants assert as a further ground for dismissal of Fink's intentional interference claim that *Grahek* stands for the proposition that Iowa Code Ch. 216 preempts claims of intentional interference with employment relations. *Grahek,* 473 N.W.2d at 34. This is an incorrect characterization of the law and of the holding in *Grahek.* *Grahek* stands for the much narrower proposition that where the only *interference* alleged is *discrimination* that would otherwise violate Iowa Code Ch. 216, the plaintiff's exclusive remedy lies under Iowa Code Ch. 216, because it provides the exclusive remedy for *discrimination.* *Grahek,* 473 N.W.2d at 34. Fink has not alleged discrimination in violation of Iowa Code Ch. 216 as the means by which allegedly interfered with her employment. Rather, her intentional interference claim is founded on the factual allegations in paragraphs 1–6 of her complaint, none of which allege any form of discrimination. Complaint, ¶¶ 1–6. Instead, Fink has alleged that Kitzman simply terminated her, thus interfering with her employment. *Grahek* does not require the court to find that Fink's intentional interference claims have been preempted by Iowa Code Ch. 216 in this case.

[t]he doctrine stems from the implied duty of good faith and fair dealing recognized in all contracts. *See* Restatement (Second) of Contracts § 205 (1981). Applied in the employment context, an employee proving a prima facie case of unjust termination could shift to the employer the burden of proving good faith as a defense. The classic case invoking such a duty of good faith would be the discharge of a thirty-year employee six months before a pension vests, or the dismissal of an employee for spurning the affections of a co-worker.

Only a small handful of states have adopted the doctrine. Although Fogel suggests we adopt the action as a tort, four of the five states that recognize the covenant treat it as a contract-based action. New Hampshire, the leading state recognizing the covenant of good faith, has since limited the action to dismissals that are in violation of public policy.

The majority of jurisdictions that have addressed the covenant have unequivocally rejected it.

*Fogel*, 446 N.W.2d at 456–57 (citations omitted). The Iowa Supreme Court has since interpreted *Fogel* as expressly rejecting a cause of action for breach of an implied covenant of good faith and fair dealing in employment situations. *Porter v. Pioneer Hi–Bred Int'l, Inc.*, 497 N.W.2d 870, 871 (Iowa 1993); *French*, 495 N.W.2d at 771; *Grahek*, 473 N.W.2d at 34.

In *Fogel*, the court's rejection of the cause of action was in part because the facts in the record simply did not compel consideration of the claim. *Fogel*, 446 N.W.2d at 457 (plaintiff claimed discharge owing to medical disability, but court upheld discharge because he was unfit to work in a food service establishment). The Iowa Supreme Court has subsequently refused to reconsider its refusal to recognize the cause of action where the bad faith claim would be preempted by Iowa Code Ch. 601A (now Iowa Code Ch. 216) because the bad faith alleged was discrimination. *Grahek*, 473 N.W.2d at 34. Also, in order for an action for breach of implied

covenant of good faith and fair dealing to lie, there must be, virtually by definition, an act of bad faith. *Id.* Mere breach of contract, by itself, is not enough. *Id.*

In the present case, the court sees no reason to consider a cause of action specifically rejected by the Iowa Supreme Court on a number of occasions. Although there has been a suggestion of a discharge in violation of public policy, thus providing some basis for the claim under the New Hampshire formulation of the tort, *Fogel*, 446 N.W.2d at 457 (citing *Howard v. Dorr Woolen Co.*, 120 N.H. 295, 297, 414 A.2d 1273, 1274 (1980)), the court is not inclined to entertain a claim repeatedly rejected by the Iowa Supreme Court, even on this narrow ground, and "unequivocally rejected" on any basis by the majority of jurisdictions to consider its validity. *Fogel*, 446 N.W.2d at 456–57 (citations omitted). Furthermore, such a claim in the circumstances presented here would seem redundant. Fink already has a viable claim, recognized by Iowa law, for discharge in violation of public policy, which is the New Hampshire formulation of the "good faith and fair dealing" claim. Fink also has remedies for a discharge based on discrimination under both Iowa and federal law. The court does not believe that Fink's breach of good faith and fair dealing claim provides any basis for this federal court to assume that the Iowa Supreme Court would recognize a cause of action it has previously rejected. Defendants are therefore entitled to summary judgment on Fink's claim of breach of covenant of good faith and fair dealing.

### F. Implied Contract

█ Fink's claim in Count VII, that she was terminated in violation of an implied unilateral contract requiring that she only be discharged for good cause, requires the court to return to the second exception Iowa law recognizes to the employment at-will doctrine.[13] Although the employment at-will doctrine allows termination of an at-will employee for any reason, an exception to the doctrine exists where a contract is created,

---

**13.** The first exception, discharge in violation of public policy, was discussed above in Section IV.C.1, beginning at page 1379.

for example, by an employer's handbook or policy manual, establishing other standards for discharge. *Borschel*, 512 N.W.2d at 566; *French*, 495 N.W.2d at 769–70; *Fogel*, 446 N.W.2d at 455.

### 1. The implied contract exception to at-will employment

 The implied unilateral contract exception to the employment at-will doctrine has been considered by Iowa courts in relatively few cases. *See French v. Foods, Inc.*, 495 N.W.2d 768 (Iowa 1993); *Hunter v. Board of Trustees of Broadlawns Medical Ctr.*, 481 N.W.2d 510 (Iowa 1992); *Fogel*, 446 N.W.2d at 456; *accord McBride v. City of Sioux City*, 444 N.W.2d 85, 91 (Iowa 1989). A contract of employment placing a case within the second exception to the at-will doctrine may be found, for example, on the basis of an employment handbook. *French*, 495 N.W.2d at 770. A handbook creates a unilateral contract, however, only if

(1) the handbook is sufficiently definite in its terms to create an *offer;* (2) the handbook has been communicated to and accepted by the employee so as to create an *acceptance;* (3) the employee has continued working, so as to provide *consideration.*

*Id.* (quoting *Fogel*, 446 N.W.2d at 456; *accord McBride v. City of Sioux City*, 444 N.W.2d 85, 91 (Iowa 1989)); *McBride*, 444 N.W.2d at 90 ("In Iowa, a contract will be implied where there has been a mutual manifestation of assent by acts and deeds (rather than words) to the same terms of an agreement," citing *Duhme v. Duhme*, 260 N.W.2d 415, 419 (Iowa 1977); *Newman v. City of Indianola*, 232 N.W.2d 568, 574 (Iowa 1975); *Sulzberger Excavating, Inc. v. Glass*, 351 N.W.2d 188, 193 (Iowa Ct.App.1984)). Unless there is an ambiguity, the question of whether a written instrument, such as an employee handbook, binds the parties in contract is a question of law. *Fogel*, 446 N.W.2d at 456.

 The threshold legal question, however, is whether the terms of the handbook "are sufficiently definite to constitute an offer of continued employment." *French*, 495 N.W.2d at 770. The court distinguished be-

tween employee handbooks that were amenable to an interpretation that discharge would be permitted only on one of the specific grounds set out in the handbook, citing *Hunter v. Board of Trustees*, 481 N.W.2d 510 (Iowa 1992) (finding a unilateral contract based on handbook's statement of seven grounds for termination), with the case before it, in which there was no provision in the handbook that limited the grounds for termination, nor suggested that a discharge could only be for cause. *French*, 495 N.W.2d at 770–71.

In *McBride*, 444 N.W.2d at 90–91, the court read provisions of an employment manual, which established a set of grievance procedures applicable to specific provisions of the manual but not extending to civil service procedures, in relation to the conduct of the parties, concluding that the plaintiff's alleged "implied" contract was "nothing more than his one-sided hope for continued employment." *Id.* at 90. The court noted that

[b]asically, a unilateral contract of employment may be created when an employer provides a handbook containing disciplinary procedures to a worker, the expressions contained in the handbook (in light of surrounding circumstances) give the worker a reasonable understanding of continued employment, and the employer has reason to know of the worker's understanding. *Cannon v. National By-Products, Inc.*, 422 N.W.2d 638, 640–41 (Iowa 1988); *see Young v. Cedar County Work Activity Center*, 418 N.W.2d 844, 848 (Iowa 1987); *see also Pine River State Bank v. Mettille*, 333 N.W.2d 622, 624–26 (Minn.1983)....

Claims under unilateral contract theory frequently break down because the disciplinary provisions are too indefinite to create an offer, ... or there is no acceptance because the disciplinary provisions are never communicated to the employee....

[In this case,] [t]he employee manual makes no clear reference to grounds or procedures for termination so it cannot constitute an "offer" of continued employment.... Further, [the handbook] can afford not protection to [the employee] because it was distributed to department

heads, not to employees, thus eliminating the "acceptance" element.

*McBride*, 444 N.W.2d at 91 (some internal citations omitted); *see also Young v. Cedar County Work Activity Ctr.*, 418 N.W.2d 844, 848 (Iowa 1987) (holding that an employee handbook not specifically incorporated into an written contract of employment containing inconsistent provisions did not become part of the contract).

However, even these formalities of contract formation may not suffice to override a statutory codification of the employment at-will doctrine for public employees. In *Norton v. Adair County*, 441 N.W.2d 347 (Iowa 1989), the Iowa Supreme Court considered implied contract claims by a public employee. The court found that the employment at-will doctrine had been codified for such employees in Iowa Code § 331.652(7), and that a collective bargaining agreement could not override this statutory codification of the doctrine. *Id.* at 362–63.

In addition to cases considering contracts implied by written materials that purported to control the employment relationship between the parties, Iowa courts have also considered claims that an employment contract had been implied in fact. In *French v. Foods, Inc.*, 495 N.W.2d 768 (Iowa 1993), the Iowa Supreme Court also considered the employee's claims of an implied-in-fact contract establishing that he could only be discharged for good cause. *French*, 495 N.W.2d at 771. The court noted that in *Cannon v. National By–Products, Inc.*, 422 N.W.2d 638, 640 (Iowa 1988), it had held that a contractual obligation may be found even if it was not the employer's intention that its handbook confer contractual rights. *French*, 495 N.W.2d at 771. However, the court concluded that such contractual rights can only arise where there have been "mutual manifestations of assent." *Id.* (citing *Duhme v. Duhme*, 260 N.W.2d 415, 419 (Iowa 1977)). Because it was clear in *French* that the employer did not "assent" to implied modification of its handbook and in fact strongly resisted it, the employee could not prevail on his implied-in-fact contract claim.

In *Porter v. Pioneer Hi–Bred Int'l, Inc.*, 497 N.W.2d 870 (Iowa 1993), the Iowa Su-

preme Court again considered the employee's claims that the course of conduct between the employer and employee established a good-cause requirement for his termination by implication. *Porter*, 497 N.W.2d at 871. The court rejected this argument, because the employee failed to adduce any specific incidents, statements, or conduct on the part of the employer that caused him to believe that he could be terminated only for good cause. *Id.* Instead, the employee stated only that such was his belief. *Id.* The court rejected the employee's claim of an implied contract, because the employee had failed to produce evidence of the required element of mutual assent. *Id.* (citing *French*, 495 N.W.2d at 771).

### 2. *Fink's Implied Contract Claim*

 Fink argues that an implied contract arose by operation of Grundy County Resolution # 17 91/92, the relevant provisions of which are as follows:

> 14. Discrimination because of political or religious opinions or affiliations or because of race, national origin or other non-merit factors shall be prohibited. This applies to any member of the public or any person involved in recruitment examination, appointment, training, promotion, retention, discipline or any other aspect of personnel administration. Discrimination against any member of the public or any person in employment on the basis of age or sex or physical disability will be prohibited except where specific age, sex, or physical requirements constitute a bona-fide qualification necessary to proper and efficient administration.
>
> 15. It is the policy of Grundy County to provide equal opportunity in employment to all persons. An individual shall not be denied equal access to county employment opportunities because of race, creed, color, religion, national origin, sex, age or physical or mental disability when the criterion of the job descriptions are [sic] met. It is also the policy of Grundy County to affirmative action measures to correct deficiencies in the county employment system where those remedies are appropriate. This policy shall be construed broadly to

effectuate its purposes. Coverage includes all aspects of employment, such as hiring, promotion, discipline, pay, benefits, training, and layoff.

Grundy County Resolution # 17–91/92, Defendants' Statement Of Material Facts.

Even assuming it could be shown that the parties to this dispute met the formalities for creation of an implied contract, offer, assent, and consideration, on the basis of this Resolution, the court concludes that this resolution does not in any way suggest that termination shall only be for cause. Instead, the Resolution establishes only that terminations may not be for discriminatory reasons. Although the Resolution also establishes a Grievance Policy, in paragraph 18, that policy provides for resolution of disputes through various levels of authority. It does not provide any criteria for the original decision, such as termination, challenged by the grievant. *Compare McBride,* 444 N.W.2d at 91 (the employee manual made no clear reference to grounds or procedures for termination, so it could not constitute an "offer" of continued employment). Even if it did establish a "good cause" ground for termination, the court concludes that such a ground in a municipal resolution could not override the statutory at-will status of an employee of the Grundy County Treasurer's Office, found in Iowa Code § 331.553(2), any more than it could override the codified at-will doctrine for deputy sheriffs in Iowa Code § 332.652(7) found in *Norton,* 441 N.W.2d at 362. Thus, defendants are entitled to summary judgment on Fink's claim of breach of an implied contract requiring that terminations be for good cause only.

### G. Discrimination Based On Political Affiliation Or Opinions

██ Fink's final claim is that she was terminated because she had been a political rival of Kitzman. Such a ground for termination would indeed be prohibited by Resolution # 17–91/92. The defendants argue that the exclusive remedy for such a wrongful termination is the grievance procedure established in the resolution itself, and that Fink lost her final appeal under this grievance procedure. Fink has argued elsewhere in her resistance to the motion for summary judgment, albeit not in reference to this issue, *on which she offers no argument,* that the court should compel the defendants to follow their own rules.

The court concludes that Fink's failure to offer any argument or to identify any evidence to support her claim of termination in retaliation for political affiliation is fatal to that claim. The bald allegations of the complaint, without more, are insufficient to preclude summary judgment. Fink is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed. R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. It is this burden she has failed to carry with respect to her claim of discharge in retaliation for political affiliation or opinions. Defendants are entitled to summary judgment on Count VIII of Fink's complaint.

### H. Fink's Damages Claims

Defendants have also moved for summary judgment on some of Fink's damages claims. Specifically, defendant Kitzman asserts that her conduct as alleged is not sufficiently wilful to entitle Fink to punitive damages on any claim. Furthermore, she asserts that as an elected official exercising discretion within her legal authority, she cannot be subjected to personal liability of any kind, including imposition of punitive damages.[14] Kitzman also argues that her reliance on the advice of the county attorney, taken before she discharged Fink, insulates her from imposition of liquidated damages on Fink's federal claims even if her conduct could still be found to be "wilful." Defendants also argue that punitive damages are not authorized for violations of Iowa Code Ch. 216, nor are punitive damages authorized against municipalities by Iowa Code Ch. 668A.

### a. Punitive damages under Iowa Code Ch. 216 and Ch. 670

██ **i. Punitive damages under Iowa Code Ch. 216.** Iowa Code § 216.15(8)(a)(8)

---

14. Kitzman has argued that she has "good faith immunity" as an elected county official.

(formerly § 601A.15(8)(a)(8)) provides the Iowa Civil Rights Commission to impose as damages for violation of the provisions of the Iowa Civil Rights Act

[p]ayment to the complainant of damages for an injury caused by the discriminatory or unfair practice which damages shall include but are not limited to actual damages, court costs and reasonable attorney fees.

Upon pursuit of a claim under chapter 216 in the courts, Iowa Code § 216.16(5) provides that

[t]he district court may grant any relief in an action under this section which is authorized by section 216.15, subsection 8 to be issued by the commission. The district court may also award the respondent reasonable attorney's fees and court costs when the court finds that the complainant's action was frivolous.

The Iowa Supreme court has consistently rejected the argument that these statutory provisions authorize punitive damages. In *Chauffeurs, Teamsters and Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375 (Iowa 1986), the Iowa Supreme Court was confronted with the argument that Iowa Code § 601A.15(8)(a)(8) "implicitly provides authority for the award of punitive damages." *Chauffeurs*, 394 N.W.2d at 384. The Commission argued that a decision of the federal district court in *Amos v. Prom, Inc.*, 115 F.Supp. 127 (N.D.Iowa 1953), held that intentional violations of the civil rights statute required an award of punitive damages, but the court found that this case preceded enactment of the Iowa Civil Rights Act. *Id.* The court noted further that

[a] later federal court decision interpreting Iowa law predicted this court would not allow an award of punitive damages under the Iowa Civil Rights Act. *High v. Sperry Corp.*, 581 F.Supp. 1246, 1247 (S.D.Iowa 1984). That court reasoned that "the phrase 'not limited to actual damages' in the Iowa statute [Iowa Code section 601A.15(8)(a)(8) ] does not necessarily imply the availability of punitive damages." *Id.* The court went on to state that it could not find a single instance where an administrative agency's award of punitive damages was upheld. *Id.* at 1248. The court acknowledged a different result might be reached if the express language

of the statute granted the Commission the power to award punitive damages. *Id.*

*Id.* The Iowa Supreme Court then conducted its own search for cases in which punitive damage awards by administrative agencies had been upheld, and found that "[t]he general rule is that an administrative agency cannot award punitive damages absent express statutory language allowing such an award." *Id.* The court adopted this "settled rule of law," and concluded that the Commission was not authorized to award punitive damages to a civil rights complainant. *Id.*

Most recently, in *Smith v. ADM Feed Corp.*, 456 N.W.2d 378 (Iowa 1990), the Iowa Supreme Court came to the same conclusion it had reached in *Chauffeurs*, adding that courts were not authorized to award punitive damages under the Iowa act either. *Smith*, 456 N.W.2d at 382–83. The court found that while Title VII includes both a "simple authorization of an action for actual and punitive damages," as well as extensive equitable relief, and Iowa Code § 601A.15 provided a similar list of equitable remedies,

[u]nlike Title VIII [sic], chapter 601A does not permit an administrative agency, or the district court under section 601A.16(5), to award punitive damages. *Chauffeurs, Teamsters and Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375, 384 (Iowa 1986). In *Chauffeurs*, we noted the general rule that an agency cannot award punitive damages absent express statutory language and concluded that the language "but not limited to actual damages" in section 601A.15(8)(a)(8) does not necessarily imply that punitive damages are available. *Id.* (citing *High v. Sperry Corp.*, 581 F.Supp. 1246, 1247 (S.D.Iowa 1984); *accord EEOC [v. Detroit Edison Co.]*, 515 F.2d [301,] 308–09 [ (6th Cir.1975) ].

*Smith*, 456 N.W.2d at 382–83. Thus, Fink is not entitled to punitive damages should she prevail on her claims under Iowa Code Ch. 216.

**ii. Municipal immunity from punitive damages under Iowa Code Ch. 670.** Defendants argue further, however, that Iowa Code § 670.4(5) provides immunity to the municipal defendants from the imposi-

tion of punitive damages on any of Fink's claims.[15] The court finds that the position of the defendants is true as to Fink's surviving claim under Iowa common law, the retaliatory discharge claim. Iowa Code § 670.4(5) provides municipalities with immunity from punitive damages. It removes that immunity if the express statute dealing with such claims does provide for the imposition of such damages. *Id.* However, the retaliatory discharge claim is founded on the common law and not upon a statute, so that no statute expressly provides either for this cause of action or for punitive damages for the successful plaintiff. Therefore, Iowa Code § 670.4(5) provides the municipal defendants with immunity from punitive damages on this common-law claim. However, the immunity provided by Iowa Code § 670.4(5) would not extend to Kitzman, because the statute applies only to municipal defendants.

 The municipal defendants next argue that Iowa Code § 670.4(5) provides them with immunity to Fink's punitive damages claims on her surviving federal claim as well. This is plainly not so. Even in suits involving both state-law claims and federal claims against municipalities, Iowa state courts have applied the provisions of chapter 670 only to the state-law claims, deciding the federal issues of liability and punitive damages solely on the basis of federal decisions. *See, e.g., Willson v. City of Des Moines,* 386 N.W.2d 76, 79–82 (Iowa 1986) (plaintiff could pursue § 1983 claim against municipality even though former Iowa Code Ch. 613A, now

Iowa Code Ch. 670, purported to provide the exclusive remedy against a municipality for violations of civil rights), *cert. denied,* 479 U.S. 948, 107 S.Ct. 432, 93 L.Ed.2d 382 (1986); *Rhiner v. City of Clive,* 373 N.W.2d 466, 470–72 (Iowa 1985) (municipal liability on § 1983 claim decided by reference to federal law, not Iowa Code Ch. 613A, now Chapter 670, although court held that Iowa Code Ch. 613A, regarding the tort liability of governmental subdivisions, provided an adequate state remedy for the claims presented, thus no federal due process claim arose); *Cunha v. City of Algona,* 334 N.W.2d 591, 594–96 (Iowa 1983) (liability of municipality on § 1983 claim decided by reference to federal law, while provisions of former Iowa Code Ch. 613A, now Iowa Code Ch. 670 were applied to state-law claims); *Dickerson v. Young,* 332 N.W.2d 93, 105 (Iowa 1983) (in case in which punitive damages were awarded against municipality following verdict against municipality on § 1983 claim, and on state-law trespass and conversion claims, the immunity of the municipality from punitive damages on the § 1983 claim was decided on the basis of *Monell v. City of New York Dep't of Social Serv.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), and *Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981), and the availability of punitive damages on the state law claims was to be decided by reference to then Iowa Code § 613A.4(5), now Iowa Code § 670.4(5)).

---

15. Liability is imposed on state subdivisions in Iowa Code § 670.2:

> Except as otherwise provided in this chapter, every municipality is subject to liability for its torts and those of its officers and employees, acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function.
>
> For the purposes of this chapter, employee includes a person who performs services for a municipality whether or not the person is compensated for the services, unless the services are performed only as an incident to the person's attendance at a municipal function.

The liability imposed in Iowa Code § 670.2 is then subject to exemptions or immunities pursuant to Iowa Code § 670.4, which provides, *inter alia,* as follows:

> The liability imposed by section 670.2 shall have no application to any claim enumerated

in this section. As to any such claim, *a municipality shall be liable only to the extent liability may be imposed by the express statute dealing with such claims and, in the absence of such express statute, the municipality shall be immune from liability. . . .*

> 3. Any claim based upon an act or omission of an officer or employee of the municipality, exercising due care, in the execution of a statute, ordinance, or regulation whether the statute, ordinance, or regulation is valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the municipality or an officer or employee of the municipality, whether or not the discretion was abused. . . .

> 5. Any claim for punitive damages.

(Emphasis added).

**1390**

Furthermore, the United States Supreme Court has held that "[m]unicipal defenses— including an assertion of sovereign immunity—to a federal right of action are, of course, controlled by federal law." *Owen v. City of Independence*, 445 U.S. 622, 647 n. 30, 100 S.Ct. 1398, 1413 n. 30, 63 L.Ed.2d 673 (1980). Thus, if the ADEA, the source of Fink's surviving federal claim, provided for punitive damages, Iowa Code § 670.4(5) would provide the municipal defendants with no immunity.

 However, punitive damages are not recoverable under the ADEA. 29 U.S.C. §§ 621–34; *Williams v. Valentec Kisco, Inc.*, 964 F.2d 723, 729 (8th Cir.1991), *cert. denied*, ── U.S. ──, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). Instead, the ADEA provides for liquidated damages, but these damages are allowable only for "willful violations." 29 U.S.C. § 626(b); *Brown v. Stites Concrete, Inc.*, 994 F.2d 553, 558 (8th Cir. 1993); *Williams*, 964 F.2d at 729; *Bethea v. Levi Strauss & Co.*, 827 F.2d 355, 358 (8th Cir.1987). As the Eighth Circuit Court of Appeals observed in *Williams*,

> [l]iquidated damages serve as a deterrent to willful violations of the Act, *see Trans World Airlines, [Inc. v. Thurston]*, 469 U.S. [111,] 125, 105 S.Ct. [613,] 623, 83 L.Ed.2d 523 [ (1985) ], and while there is an aspect to such damages that is punitive in nature, *Rademaker v. Nebraska*, 906 F.2d 1309, 1313 (8th Cir.1990), they are not the equivalent of punitive damages. *See Bruno v. Western Elec. Co.*, 829 F.2d 957, 967 (10th Cir.1987).

*Williams*, 964 F.2d at 729. Thus, the court concluded that a waiver of punitive damages as to another claim was not a waiver of a liquidated damages claim under the ADEA. *Id.*

In the present case, the court concludes that punitive damages are not available at all on Fink's surviving claims under the ADEA and Iowa Code § 216, nor are punitive damages available against the municipal defendants on Fink's surviving retaliatory discharge claim. Two damages issues remain, however. The first is whether defendants showed sufficient "willfulness" to be held liable for liquidated damages under the ADEA.

The second damages issue is whether Kitzman can be held liable for any damages at all as an elected official who acted within her legal authority in firing Fink.

**b. Liability for liquidated damages under the ADEA**

The Eighth Circuit Court of Appeals has adopted the standards for "willfulness" under the ADEA found in *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 105 S.Ct. 613, 83 L.Ed.2d 523 (1985), in *Brown*, 994 F.2d at 558:

> In *Trans World Airlines*, ... the Supreme Court held that an employer's violation of the ADEA is "willful" if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA."

*Brown*, 994 F.2d at 558. The court in *Brown* also held that " '[o]nce a 'willful' violation has been shown, the employee need not additionally demonstrate that the employer's conduct was outrageous, or provide direct evidence of the employer's motivation....' " *Id.* at 559 (quoting *Hazen Paper Co. v. Biggins*, ── U.S. ──, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993)). The court then held that *Biggins* required rejection of its former test of willfulness under the ADEA, which had required "additional evidence" beyond that which established discrimination. *Id.* at 559 (citing as establishing or requiring this superseded standard *Glover v. McDonnell Douglas Corp.*, 981 F.2d 388, 395–96 (8th Cir.1992), *cert. granted and judgment vacated*, ── U.S. ──, 114 S.Ct. 42, 126 L.Ed.2d 13 (1993); *Reyher v. Champion Int'l Corp.*, 975 F.2d 483, 487 (8th Cir.1992); *Williams*, 964 F.2d at 729; *Rademaker v. Nebraska*, 906 F.2d 1309, 1313 (8th Cir.1990); *Morgan v. Arkansas Gazette*, 897 F.2d 945, 952 (8th Cir.1990); *Bethea*, 827 F.2d at 359). The court concluded that the proper test is as follows:

> To support an award of liquidated damages [under the ADEA], therefore, the sole relevant determination is whether the evidence meets the standard that the employer "either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." The question is not whether the evidence used to

establish willfulness is different from and additional to the evidence used to establish a violation of the ADEA, but whether the evidence—additional or otherwise—satisfies the distinct standard used for establishing willfulness.

*Brown,* 994 F.2d at 560.

 The defendants contend that, because Kitzman consulted with the county attorney prior to terminating Fink, the finder of fact could determine that there was a "willful" violation, but nonetheless could not impose liquidated damages, citing *Hill v. J.C. Penney Co., Inc.,* 688 F.2d 370 (5th Cir.1982). However, this decision antedates the Eighth Circuit Court of Appeals' reformulation of the test for liquidated damages based in *Brown.* The court is unwilling to hold on this basis that consultation of an attorney prior to discharging the complaining employee is sufficient to preclude imposition of liquidated damages under the ADEA as a matter of law.

 The court finds further that there is a genuine issue of material fact as to whether Kitzman acted willfully in discharging Fink, such that the defendants are not entitled to summary judgment on Fink's liquidated damages claim. Fink has presented evidence sufficient to suggest that Kitzman targeted Fink for termination on the basis of age, and did terminate her, with reckless disregard for whether her termination was prohibited by the ADEA. That evidence is discussed above in the court's determination that summary judgment is inappropriate on Fink's substantive claim of violation of the ADEA.

### c. *Kitzman's liability*

 Kitzman argues the rather extraordinary position that she cannot be held liable at all on any of Fink's claims, because she was an elected official acting within her authority in terminating Fink. Kitzman cites *Elview Constr. Co., Inc. v. North Scott Community Sch. Dist.,* 373 N.W.2d 138, 145 (Iowa 1985), as her sole authority for this sweeping proposition. However, *Elview Constr.* provides for the immunity of elected officials only in the narrow circumstances of a case involving illegal contracts, and the

present case involves tort liability. The court finds that it would bizarre indeed if liability could not be extended to public officials for their tortious conduct, however egregious. Even if the immunity described in *Elview Construction* could be as broadly construed as defendants assert, it would not protect Kitzman from liability in all circumstances. Even under *Elview Construction,* the immunity shield was broken by an adequate showing of bad faith, self-dealing, or fraud. *Elview Constr.,* 373 N.W.2d at 145. The tort alleged here, retaliatory discharge, by its very nature, suggests either intentional or bad faith conduct. One cannot retaliatorily discharge an employee in "good faith." Thus, if Fink can establish to the satisfaction of the trier of fact that she was discharged in retaliation for filing a workers compensation claim, and the court has already found that there is a genuine issue of material fact on this issue entitling the trier of fact to hear the claim, Kitzman could be held liable for her misconduct despite *Elview Constr.* Contrary to Kitzman's assertions, the common-law rule in Iowa is that public officials share the same, but not greater, liability to injured parties as other defendants under like circumstances. *Sankey v. Richenberger,* 456 N.W.2d 206, 209 (Iowa 1990).

Although Kitzman has not specifically invoked its provisions, Iowa Code Ch. 670 provides a more plausible ground for arguing the immunity of a public official from the claims presented here. Kitzman and the other defendants have argued the essential elements of this statutory immunity defense by asserting that Kitzman's conduct in discharging Fink was in the performance of a "discretionary function" of her office. However, Iowa Code Ch. 670 (formerly chapter 613A) *limits,* but does not eliminate, the liability of such officials:

> Suits against municipal employees in their individual capacities existed before the tort claims act, just as tort claims against other parties. *See Vermeer v. Sneller,* 190 N.W.2d 389, 391–92 (Iowa 1971). Except as modified by chapter 613A, such rights of action remain intact. Thus we held in a similar case against employees of a municipality that if the employee's acts are out-

side the scope of employment, the tort claims act is inapplicable....

*Lamantia v. Sojka,* 298 N.W.2d 245, 246 (Iowa 1980) (citing *Roberts v. Timmins,* 281 N.W.2d 20, 22 (Iowa 1979), as the case finding the employee's acts outside the scope of employment).

The first provision of Iowa Code Ch. 670 to modify that common law tort liability is Iowa Code § 670.8 (formerly § 613A.8). It provides that, although the governing body of municipalities must defend, "save harmless and indemnify" officers and employees against "any tort claim or demand," that provision does not provide for the immunity of such individuals, only that a defense and indemnity must be provided by the municipal employer. Iowa Code § 670.8. Furthermore, the duty to defend, indemnify, and save harmless does not extend to liability for punitive damages. *Id.; Vlotho v. Hardin County,* 509 N.W.2d 350, 353 (Iowa 1993). Thus, even the provisions of Iowa Code § 670.8 do not excuse Kitzman from liability, but only transfer part of the costs of her liability to her municipal employer. Kitzman still remains solely liable for any punitive damages that may be assessed against her for her tortious conduct.

Iowa Code § 670.12, however, does provide for Kitzman's *immunity* from liability, albeit with certain exceptions:

All officers and employees of municipalities are not personally liable for claims which are exempted under section 670.4, except claims for punitive damages, and actions permitted under section 85.20 [workers compensation]. An officer or employee of a municipality is not liable for punitive damages as a result of acts in the performance of a duty, unless actual malice or willful, wanton and reckless misconduct is proven.

Iowa Code § 670.12. Kitzman could assert, and the county has asserted, that the acts complained of here fall within Iowa Code § 670.4(3):

3. Any claim based upon an act or omission of an officer or employee of the municipality, exercising due care, in the execution of a statute, ordinance, or regulation whether the statute, ordinance, or regula-

tion is valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of the municipality or an officer or employee of the municipality, whether or not the discretion was abused....

Specifically, defendants assert that Kitzman performed a "discretionary function" when she terminated Fink. However, such an assertion fails as a matter of law. In *Hansen v. City of Audubon,* 378 N.W.2d 903, 906 (Iowa 1985), the Iowa Supreme Court concluded that its "planning vs. operational" test of what constitutes a "discretionary function," developed in the context of the State Tort Claims Act, also established the extent of "discretionary function" immunity provided by Iowa Code § 670.4(3):

In *Butler [v. State of Iowa,* 336 N.W.2d 416, 419–20 (Iowa 1983)], we further defined planning and operational as follows:

The planning level is generally characterized as the policy making stage and is said to encompass decisions "that involve the formulation of policy, that call for a weighing of competing interests, that require an assessment of the practicability or feasibility (including the consideration of budgetary constraints) of a proposed course of action, or that entail an evaluation of how the public interest will best be served.

The implementation of decisions made at the planning level is operational; decisions made at the operational level are not covered by the discretionary function exception.

336 N.W.2d at 419 (citations omitted). We went on to hold that the State's decision not to update previously installed guardrails was made at the operational, rather than the planning, level and did not meet the exception of a discretionary decision. *Id.* at 420.

*Hansen,* 378 N.W.2d at 906. In *Hansen,* the court went on to conclude that the City's decision not to maintain and repair its sanitary sewer system was an operational decision, and not an exercise of discretionary function, because, although long-range policy decisions are involved in whether to replace a

sewer system, failure to repair or properly maintain a known defective sewer system was an operational decision. *Id.* Compare *Moyer v. City of Des Moines,* 505 N.W.2d 191, 192 (Iowa 1993) (on motion to dismiss, allegations in complaint that defendants in fact had no discretion was sufficient to deny the motion on the grounds of the "discretionary function" immunity of Iowa Code § 670.4(3)).

In the present case, Kitzman's decision to reduce staff bears all of the indicia of a planning decision. However, her decision to fire Fink as part of that reduction in force was an operational decision. The decision to terminate a particular employee was the implementation of her decision to reduce staff made at the planning level, and therefore is operational; decisions made at the operational level are not covered by the discretionary function exception. *Id.* Kitzman is not entitled to immunity under Iowa Code § 670.12 for her operational decision to fire Fink. For the same reasons, the municipal defendants could not assert that they should be exempt from liability for Kitzman's conduct under Iowa Code § 670.4(3). Because Kitzman's conduct does not fall within the discretionary functions exception, the county cannot assert the immunity provided by this subsection either.

## I. Immunity Of The Grundy County Board Of Supervisors

In its own motion, the Board has moved for summary judgment on Fink's claims on the ground that its only involvement with the circumstances of Fink's termination was in Fink's appeal to the Board of her grievance arising from Kitzman's decision to terminate her. The Board argues that it acted in a judicial capacity in adjudicating that appeal, and therefore it is entitled to judicial or quasi-judicial absolute immunity. However, "[g]iven the sparing recognition of absolute immunity by ... the Supreme Court ..., one claiming such immunity must demonstrate clear entitlement." *Ramirez v. Oklahoma Dep't of Mental Health,* 41 F.3d 584, 592 (10th Cir.1994); *see also Antoine v. Byers & Anderson,* —— U.S. ——, ——, 113 S.Ct. 2167, 2169, 124 L.Ed.2d 391 (1993) ("The

proponent of a claim to absolute immunity bears the burden of establishing the justification for such immunity."); *Robinson v. Freeze,* 15 F.3d 107, 108 (8th Cir.1994); *Robinson v. Volkswagenwerk AG,* 940 F.2d 1369, 1370 (10th Cir.1991), *cert. denied sub nom. Herzfeld & Rubin v. Robinson,* 502 U.S. 1091, 112 S.Ct. 1160, 117 L.Ed.2d 408 (1992). Furthermore, "[a]bsolute immunity ... is "strong medicine, justified only when the danger of [officials' being] deflect[ed from the effective performance of their duties] is very great." *Forrester v. White,* 484 U.S. 219, 108 S.Ct. 538, 98 L.Ed.2d 555 (1988) (quoting with approval Posner, J., dissenting below, 792 F.2d 647, 660 (7th Cir.1986)). The Supreme Court has stated that "[t]he presumption is that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties. We have been quite sparing in our recognition of absolute immunity, and have refused to extend it any further than its justification would warrant." *Antoine,* —— U.S. at —— n. 4, 113 S.Ct. at 2169 n. 4 (quoting *Burns v. Reed,* 500 U.S. 478, 486–87, 111 S.Ct. 1934, 1939–40, 114 L.Ed.2d 547 (1991) (internal quotation marks and citations omitted); *Freeze,* 15 F.3d at 108; *Zar v. South Dakota Bd. of Examiners of Psychologists,* 976 F.2d 459, 464 (8th Cir.1992) (not reaching question of absolute judicial or quasi-judicial immunity, because qualified immunity was sufficient).

### 1. Standards for quasi-judicial immunity

A recent synopsis of the standards for entitlement to this kind of immunity was stated by the Tenth Circuit Court of Appeals:

Since *Butz* [*v. Economou,* 438 U.S. 478, 508, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978)] the Court has made it clear that application of judicial immunity outside the traditional judicial context is premised upon the existence of procedural guarantees and safeguards comparable to those found in federal administrative adjudication proceedings. In *Cleavinger v. Saxner,* 474 U.S. 193, 106 S.Ct. 496, 88 L.Ed.2d 507 (1985), the Court refused to extend absolute judicial immunity to members of a prison discipline committee re-

**1394**

sponsible for hearing cases involving inmates charged with prison rules infractions. Citing *Butz,* the Court reaffirmed its "functional approach" to absolute immunity, stressing that such immunity "flows not from rank or title or 'location within the Government,' ... but from the nature of the responsibilities of the individual official." *Id.* at 201, 106 S.Ct. at 500 (citation omitted).

*Ramirez v. Oklahoma Dep't of Mental Health,* 41 F.3d 584, 590 (10th Cir.1994). Thus, the court concluded that a succinct statement of the test for quasi-judicial immunity was whether the conduct of the party seeking such immunity "shares enough of the characteristics of the judicial process that those who participate in such adjudication should also be immune from suits for damages." *Id.* (quoting *Butz,* 438 U.S. at 512–13, 98 S.Ct. at 2913–14). These themes are developed further in the discussion that follows.

■ First, the analysis of quasi-judicial immunity depends upon " 'the character of the act in question, not the character of the actor,' " *Forrester,* 484 U.S. at 228, 108 S.Ct. at 544 (quoting *Ex parte State of Virginia,* 100 U.S. (10 Otto) 339, 348, 25 L.Ed. 676 (1880)), or, to put it another way, it is "the nature of the function performed, not the identity of the actor who performed it" that "informs [the court's] analysis. *Id.,* 484 U.S. at 229, 108 S.Ct. at 545; *see also Antoine,* — U.S. at ——, 113 S.Ct. at 2169 ("judicial immunity is 'justified and defined by the functions it protects and serves,' " quoting *Forrester,* 484 U.S. at 227, 108 S.Ct. at 544); *Burns,* 500 U.S. at 486, 111 S.Ct. at 1939 (immunity analysis requires a "functional approach"); *Brown v. Griesenauer,* 970 F.2d 431, 436 (8th Cir.1992). In determining which officials perform functions that might justify a full exemption from liability, the Supreme Court has " 'undertaken a considered inquiry into the immunity historically

accorded the relevant official at common law and the interests behind it.' " *Butz,* 438 U.S. at 508, 98 S.Ct. at 2911 (quoting *Imbler v. Pachtman,* 424 U.S. 409, 421, 96 S.Ct. 984, 990, 47 L.Ed.2d 128 (1976)); *see also Burns,* 500 U.S. at 486–87, 111 S.Ct. at 1939; *Freeze,* 15 F.3d at 108.[16]

The Supreme Court found that

[t]he doctrine of judicial immunity is supported by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability. Accordingly, the "touchstone" for the doctrine's applicability has been "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." *[Burns],* 500 U.S., at 498, 111 S.Ct., at 1946 (SCALIA, J., concurring in judgment in part and dissenting in part). When judicial immunity is extended to officials other than judges, it is because their judgments are "functional[ly] comparab[le]" to those of judges—that is, because they, too, "exercise a discretionary judgment" as a part of their function. *Imbler v. Pachtman,* 424 U.S., at 423, n. 20, 96 S.Ct., at 991, n. 20. *Cf. Westfall v. Erwin,* 484 U.S. 292, 297–298, 108 S.Ct. 580, 584, 98 L.Ed.2d 619 (1988) (absolute immunity from state-law tort actions available to executive officials only when their conduct is discretionary).

*Antoine,* — U.S. at ——, 113 S.Ct. at 2171 (emphasis added); *Freeze,* 15 F.3d at 108 (quoting *Antoine* ). The Supreme Court described the protection of impartial decision-making afforded by the doctrine in this way:

"For it is a general principal of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to

---

16. As to historical immunity for judges,

[j]udicial immunity apparently originated, in medieval times, as a device for discouraging collateral attacks and thereby helping to establish appellate procedure as the standard system for correcting judicial error.... [J]udicial immunity also protected judicial independence

by insulating judges from vexatious actions prosecuted by disgruntled litigants."
*Brown v. Griesenauer,* 970 F.2d 431, 435 (8th Cir.1992) (quoting *Forrester,* 484 U.S. at 225, 108 S.Ct. at 543, and citing *Bradley v. Fisher,* 80 U.S. (13 Wall.) at 347 (emphasizing "that independence without which no judiciary can either be respectful or useful")).

act upon his own convictions, without apprehension of personal consequences to himself. Liability to answer to every one who might feel himself aggrieved by the action of the judge, would be inconsistent with the possession of this freedom, and would destroy that independence without which no judiciary can be either respectable or useful."

*Id.,* ——— U.S. at ——— n. 10, 113 S.Ct. at 2171 n. 10 (quoting *Bradley v. Fisher,* 13 Wall. 335, 347, 20 L.Ed. 646 (1872), and also citing *Mireles v. Waco,* 502 U.S. 9, 10, 112 S.Ct. 286, 287, 116 L.Ed.2d 9 (1991)); *see also Butz,* 438 U.S. at 512, 98 S.Ct. at 2913 ("Absolute immunity is thus necessary to assure that judges, advocates, and witnesses can perform their respective functions without harassment or intimidation.").

In *Cleavinger,* the Court recognized that lack of two particular factors precluded application of judicial or quasi-judicial immunity to a prison disciplinary review committee: "independence" and the availability of procedural safeguards similar to those found in the Administrative Procedures Act. *Cleavinger,* 474 U.S. at 203–04, 106 S.Ct. at 501–03; *Ramirez,* 41 F.3d at 590–91; *Zar,* 976 F.2d at 464. As to the "independence" factor, the Court found that

> [T]he members of the committee, unlike a federal or state judge, are not "independent"; to say that they are is to ignore reality. They are not professional hearing officers, as are administrative law judges. They are, instead, prison officials, albeit no longer of the rank and file, temporarily diverted from their usual duties. . . . They are employees of the Bureau of Prisons and they are the direct subordinates of the warden who reviews their decision. They work with the fellow employee who lodges the charge against the inmate upon whom they sit in judgment. The credibility determination they make often is one between a co-worker and an inmate. They thus are under obvious pressure to resolve a disciplinary dispute in favor of the institution and their fellow employee. . . . It is the old situational problem of the relationship between the keeper and the kept, a

relationship that hardly is conducive to a truly adjudicatory performance.

*Cleavinger,* 474 U.S. at 203–04, 106 S.Ct. at 501–03 (citations omitted). As to the second requirement, the availability of APA-like procedural safeguards, the Court wrote:

> Under the [Prison] Bureau's disciplinary policy in effect at the time of respondents' hearings, few of the procedural safeguards contained in the Administrative Procedure Act under consideration in *Butz* were present. The prisoner was to be afforded neither a lawyer nor an independent nonstaff representative. There was no right to compel the attendance of witnesses or to cross-examine. There was no right to discovery. There was no cognizable burden of proof. No verbatim transcript was afforded. Information presented often was hearsay or self-serving. The committee members were not truly independent. In sum, the members had no identification with the judicial process of the kind and depth that has occasioned absolute immunity.

*Cleavinger,* 474 U.S. at 206, 106 S.Ct. at 503; *see also Howard v. Suskie,* 26 F.3d 84, 86 (8th Cir.1994) (no absolute immunity absent adjudicatory safeguards spelled out in *Cleavinger* ); *Krueger v. Lyng,* 4 F.3d 653, 656–57 (8th Cir.1993) (same); *Zar,* 976 F.2d at 464 (administrative safeguards). However, other factors identified in *Butz* that acted as "checks on malicious actions" by the adjudicator, specifically, "[whether there are] safeguards built into the judicial process [that] tend to reduce the need for private damages actions as a means of controlling unconstitutional conduct," and "[t]he insulation of the judge from political influence, the importance of precedent in resolving controversies, the adversary nature of the process, and the correctability of error on appeal." *Butz,* 438 U.S. at 512, 98 S.Ct. at 2913.

### 2. *Quasi-judicial immunity of elected boards*

This case illustrates well the conclusion of the Sixth Circuit Court of Appeals that "[u]nfortunately, the various activities of most [government] officials cannot be [easily or definitively] characterized as only administrative, legislative, or judicial." *Haskell v.*

*Washington Township,* 864 F.2d 1266, 1277–78 (6th Cir.1988) (enacting municipal zoning ordinances could be legislative or administrative); *Brown,* 970 F.2d at 436 (quoting *Haskell*). In *Brown,* the Eighth Circuit Court of Appeals considered whether a the impeachment of a city mayor by the council of alderman was a legislative or judicial function. *Brown,* 970 F.2d at 431. Rejecting the argument that impeachment was the result of a vote made that act non-judicial, the court held that "[a]lthough a local legislator may vote on an issue, [the act of voting] alone does not necessarily determine that he or she was acting in a legislative capacity." *Id.* at 437 (quoting *Cinevision Corp. v. City of Burbank,* 745 F.2d 560, 580 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2115, 85 L.Ed.2d 480 (1985), and citing *O'Brien v. City of Greers Ferry,* 873 F.2d 1115, 1119–20 (8th Cir.1989) (city council vote on special appropriation held executive act), and recognizing contrary authority in *Espanola Way Corp. v. Meyerson,* 690 F.2d 827, 829 (11th Cir.1982) (act of voting constitutes exercise of legislative decision-making which entitles city council member to absolute immunity because voting is legislative function), *cert. denied,* 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 791 (1983)). The court concluded that

> impeachment proceedings are essentially judicial or adjudicatory in nature, even though the decision-making body and the form of the proceedings are legislative. "A judicial inquiry investigates, declares and enforces liabilities as they stand on present or past facts and under laws supposed already to exist." *Prentis v. Atlantic Coast Line Co.,* 211 U.S. [210] at 226, 29 S.Ct. [67] at 69 [53 L.Ed. 150] [ (1908) ]. "A declaration on rights as they stand must be sought, not on rights which may arise in the future, and there must be an actual controversy over an issue.... The form of the proceeding is not significant. It is the nature and effect which is controlling." *In re Summers,* 325 U.S. 561, 566–67, 65 S.Ct. 1307, 1310–11, 89 L.Ed. 1795 (1945) (state supreme court's refusal to admit bar applicant held judicial proceeding). Here, the board of aldermen, sitting as a board of impeachment, was required

to perform an adjudicatory function in deciding whether there was legal cause to impeach the mayor and, if so, whether to remove the mayor from office. *See Fitzgerald v. City of Maryland Heights,* 796 S.W.2d 52, 56–57 (Mo.Ct.App.1990) (purely political reasons do not constitute requisite legal cause for impeachment; legal cause means misfeasance, malfeasance or nonfeasance). In other words, the board of aldermen, sitting as a board of impeachment, functioned like judges in that they were required to determine whether bias existed, to hear testimony and receive evidence, to evaluate the credibility of witnesses and weigh the evidence, and to make findings of fact and conclusions of law.

*Id.* at 437.

The court then considered whether, in light of the *Cleavinger* and *Butz* factors, the aldermen were entitled to absolute judicial immunity. The court concluded that the public interest in decisions free from intimidation was served by applying immunity, procedural safeguards were in place in the form of a state administrative procedures act, the case was contested and adversarial, the parties were allowed to conduct discovery, oral evidence was taken under oath, parties were allowed to call and examine or cross-examine witnesses, a record of the proceedings was kept, and a written set of findings of fact and conclusions of law followed. *Id.* Furthermore, the role of precedent was important in the impeachment proceedings, and judicial review was available. *Id.* The court next considered whether the aldermen were sufficiently insulated from political influence:

> the individual board members are elected officials and to that extent are not insulated from political influence. However, political or electoral pressure alone cannot deprive government officials of absolute immunity or qualified immunity; after all, legislators are the quintessential elected officials and they enjoy absolute immunity for acts taken in a legislative capacity. Similarly, many state judges are elected and nonetheless enjoy absolute immunity for acts taken in a judicial capacity. We think that, at least for purposes of immunity analysis, the insulation-from-political-in-

fluence factor does not refer to the independence of the government official from the political or electoral process, but instead to the independence of the government official as a decision-maker. We think the individual board members as decision-makers in municipal impeachment proceedings are as independent as administrative law judges or as federal or state judges. Unlike the members of the prison disciplinary committee in *Cleavinger* who were prison employees and the direct subordinates of the warden who reviewed their disciplinary decisions, 474 U.S. at 204, 106 S.Ct. at 502, the individual board members are not employees and have no direct supervisors. They are certainly not subordinate to the state judges who review the impeachment decision, and they are under no institutional pressure to resolve the dispute in any particular way. Individual board members are admittedly not "professional hearing officers" like administrative law judges, state judges or parole board members. Nonetheless, as adjudicators in impeachment proceedings, they must be fair and impartial. *See Fitzgerald v. City of Maryland Heights*, 796 S.W.2d at 59.

In sum, we hold that defendants acted in a judicial capacity in voting to impeach the mayor and that their function as a board of impeachment was sufficiently comparable to "classic" adjudication so as to justify absolute immunity from personal liability for damages.

*Brown*, 970 F.2d at 439.

In contrast, in *Zamsky v. Hansell*, 933 F.2d 677 (9th Cir.1991), the court concluded that a Land Conservation and Development Commission (LCDC) was not entitled to quasi-judicial immunity for its decisions to rezone property. The court found that the LCDC's proceedings were not adversarial, and rather than simply adjudicating rights, the LCDC gave recommendations for bringing land use plans into compliance with the law. *Id.* at 679 (applying *Butz* factors). Nor was the LCDC insulated from the agency it represented, being the same body that promulgated the regulations in the first place. *Id.* (citing *Butz*, 438 U.S. at 513–14, 98 S.Ct.

at 2914–15 (noting the extensive mechanisms used to insulate ALJs from the agency in which they serve); *Wood v. Strickland*, 420 U.S. 308, 319–20, 95 S.Ct. 992, 999–1000, 43 L.Ed.2d 214 (1975) (noting the combined legislative and adjudicative functions of school board members and concluding that they are not entitled to absolute immunity); *Cleavinger*, 474 U.S. at 203–04, 106 S.Ct. at 501–03 (prison disciplinary board members who also serve as prison guards not absolutely immune). The court therefore considered that qualified immunity provided an adequate shield for the conduct of these officials. *Id.*

Similarly, in *Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d 1499 (11th Cir.1990), the Eleventh Circuit Court of Appeals concluded that school board members were not entitled to quasi-judicial immunity for their involvement in the termination of a school board employee. The court first identified the standards stated in *Cleavinger*, but then concluded that

the Court has explicitly declined to extend absolute judicial immunity protection to actions taken by school board members. In *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), the Court noted that school board members function as "adjudicators in the school disciplinary process," and they must "judge whether there have been violations of school regulations and, if so, the appropriate sanctions for the violations." *Id.* at 319, 95 S.Ct. at 999. However, despite the school board's adjudicative function, the Court held that board members were to be protected by qualified immunity only: "[A]bsolute immunity would not be justified since it would not sufficiently increase the ability of school officials to exercise their discretion in a forthright manner to warrant the absence of a remedy for students subjected to intentional or otherwise inexcusable deprivations." *Id.* at 320, 95 S.Ct. at 1000. *See also Cleavinger*, 474 U.S. at 204–05, 106 S.Ct. at 502 (explaining the Court's holding in *Wood* and relying on *Wood*'s holding to deny absolute judicial immunity to a prison's Institution Discipline Committee). Although this case involves a school board's decision to discharge an employee rather than an instance of student disci-

pline, as was involved in *Wood*, we conclude that the function of the school board in this case was substantially similar to the function of the board in *Wood*. The Court's ruling in *Wood* therefore precludes an extension of absolute immunity to the defendants in this case.

*Id.* at 1508.

In *Bettencourt v. Board of Registration in Medicine of the Commonwealth of Mass.*, 904 F.2d 772 (1st Cir.1990), the court promulgated three questions to determine how closely the actions of a medical registration board resembled judicial functions to determine the availability of quasi-judicial immunity to the board's members:

> First, does a Board member, like a judge, perform a traditional "adjudicatory" function, in that he decides facts, applies law, and otherwise resolves disputes on the merits (free from direct political influence)? Second, does a Board member, like a judge, decide cases sufficiently controversial that, in the absence of absolute immunity, he would be subject to numerous damages actions? Third, does a Board member, like a judge, adjudicate disputes against a backdrop of multiple safeguards designed to protect a physician's constitutional rights?

*Bettencourt*, 904 F.2d at 783 (citing *Butz*, 438 U.S. at 510–13, 98 S.Ct. at 2912–14; *Austin Mun. Securities v. National Ass'n of Securities*, 757 F.2d 676, 688 (5th Cir.1985); *Simons v. Bellinger*, 643 F.2d 774, 778 (D.C.Cir.1980)). The court answered each of these questions in the affirmative, and therefore applied the immunity. *Id.*

### 3. The Board's claim of quasi-judicial immunity

■ In the present case, the court concludes that, although it is a very close question, the Board is not entitled to quasi-judicial immunity for its involvement in Fink's appeal of her grievance arising from her termination. Admittedly, the appeal procedure bears many of the marks of an adjudicatory function, including adversarial proceedings, opportunity to present testimony, representation of the complainant by counsel, written findings and conclusions, and some procedural safeguards. Furthermore, the critical factor is not that the Board was elected, nor that it voted on disposition of Fink's appeal. The critical factor in analysis of this attempt to invoke the privilege is that the Board both acted as the appellate body and had originally promulgated the regulations whereby Fink brought her complaint before the Board. Thus, the Board was not properly insulated from the regulations in question. This factor is not undercut by the lack of guiding principles for the exercise of the power to discharge employees in the resolution establishing the grievance appeal procedure; rather, it is supported by it. The Board is left free to apply whatever standards it deems appropriate to the particular grievance before it, and that broad discretion was granted by the resolution the Board itself enacted. Furthermore, the lack of standards in the resolution suggest that precedent and prior articulation of principles had little to do with the Board's ultimate decision. Thus, the court concludes that the Board is not entitled to quasi-judicial immunity in this case, and its motion for summary judgment on that ground must be denied.

## V. CONCLUSION

The court concludes that the motion for summary judgment by all defendants must be denied in part and granted in part, while the motion of the Board must be denied in its entirety. First, as to Fink's claim of age discrimination in violation of the ADEA, the court concludes that Fink has, at the least, generated a genuine issue of material fact on each element of her *prima facie* case of age discrimination in this reduction-in-force case. Kitzman, while admitting that Fink's performance entered into her decision to terminate her instead of other employees, has repeatedly asserted that she did not fire Fink for poor performance. Kitzman's assertions, at a minimum, generates a material issue of fact as to whether or not Fink was performing at a level that met her employer's legitimate expectations. Furthermore, despite defendants' contentions that Fink's job is "gone," there is a genuine issue of material fact as to whether her job, in its various parts, continued, because other employees must do some of the duties formerly assigned

to Fink, even though her duties were not unique. More importantly, the allegations and counterallegations concerning the speed with which Kitzman made the discharge decision and the reasons she selected Fink to be discharged when she retained younger employees with less experience provide "some additional evidence" that age was a factor, something Fink must show to preclude summary judgment on her ADEA claim. As with Fink's federal age discrimination claim, there is a genuine issue of material fact on her state-law age discrimination claim precluding summary judgment.

However, defendants are entitled to summary judgment on both Fink's federal and state-law claims of disability discrimination. The court first concluded that the proper *prima facie* showing for a claim of disability discrimination under the ADA was one similar to the *prima facie* case of discrimination in other contexts, which requires the plaintiff to establish an *inference* of discrimination on the basis of a disability. The court concluded further that the inference could arise even if the employer replaced the plaintiff with a person with a lesser or more easily accommodated disability, rather than replacing the plaintiff with a non-member of the protected class. However, the court concludes that Fink has failed to generate a genuine issue of material fact that she is sufficiently disabled to invoke the protection of either the ADA or Iowa Code Ch. 216. The record demonstrates only that Fink is subject to a lifting restriction as the result of her carpal tunnel syndrome, but does not establish that this restriction impaired either her performance of her job with the County or impaired her pursuit of a wide range of employment opportunities. Nor did Fink present sufficient evidence to generate a material issue of fact that her employer regarded her as disabled. For the same reasons Fink was not "disabled" within the meaning of the ADA, she is not "disabled" within the meaning of Iowa Code Ch. 216. Defendants are therefore entitled to summary judgment on Fink's disability discrimination claims.

As to Fink's claim of retaliatory discharge for filing a workers compensation claim, Fink has produced sufficient evidence to preclude summary judgment. Fink's evidence suggests that Kitzman threatened her not to file a workers compensation claim, told her the county would not pay for her treatment, and told her she doubted that Fink's condition was work-related. A genuine issue of material fact therefore exists concerning whether Fink was fired for pursuing such a claim precluding summary judgment on Fink's retaliation claim.

The court next concludes that Fink cannot pursue a claim of tortious interference with a contract, because Kitzman, as the representative of the County controlling Fink's employment with the county, could not interfere with a contract between Fink and the County. Nor could Kitzman interfere with a business relationship between Fink and the County, for whom Kitzman acted, because she was a party or agent of a party involved in the relationship, not a stranger to the relationship. Defendants are entitled to summary judgment on Fink's interference with a contract or business relationship claims. Defendants are also entitled to summary judgment on Fink's claim of breach of covenant of good faith and fair dealing, because the court is not inclined to entertain a claim repeatedly rejected by the Iowa Supreme Court. Furthermore, such a claim in the circumstances presented here would seem redundant, because Fink already has a viable claim for discharge in violation of public policy. Defendants are also entitled to summary judgment on Fink's claim under an implied contract, because the court concludes that the resolution to which Fink points as implying such a contract simply does not establish a "good cause" requirement for her dismissal, and, even if it did, a municipal resolution could not override the statutory at-will status of an employee of the Grundy County Treasurer's Office, found in Iowa Code § 331.553(2). Defendants are also entitled to summary judgment on Fink's claim of retaliation for political opinions or affiliation, because Fink has failed to designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

As to the issues of liability and immunity raised by defendants, the court concludes

punitive damages are not available for Fink's claims under Iowa Code Ch. 216, and Iowa Code § 670.4(5) provides the municipal defendants with immunity from punitive damages on Fink's surviving common-law claim of retaliatory discharge. Such a state-law defense cannot apply to a federal claim, but punitive damages are not recoverable under the ADEA. Instead, the ADEA provides for "liquidated damages." The court rejects the argument that consulting an attorney provides immunity to a liquidated damages claim under the ADEA, and finds further that there is a genuine issue of material fact as to whether Kitzman acted willfully in discharging Fink, such that the defendants are not entitled to summary judgment on Fink's liquidated damages claim under the ADEA.

The court has next rejected Kitzman's assertion of a common-law immunity for her acts as an elected county official, finding that the case she cites in support of that proposition must be construed far too narrowly to provide immunity in the circumstances here. However, the court has also considered Kitzman's statutory immunity under Iowa Code § 670.12, but concludes as a matter of law that Kitzman's decision to terminate Fink was operational, and therefore not a "discretionary function" entitling her to the immunity found in Iowa Code § 670.4(3). For similar reasons, the County cannot invoke the immunity of Iowa Code § 670.4(3) for claims against it for Kitzman's alleged misconduct.

Finally, although it is a very close question, the court finds that the Board is not entitled to summary judgment on its own motion asserting quasi-judicial immunity. The court finds that the critical factor in analysis of this attempt to invoke the privilege is that the Board both acted as the appellate body and had originally promulgated the regulations whereby Fink brought her complaint before the Board. Thus, the Board was not properly insulated from the regulations in question. Therefore, its motion for summary judgment on the ground of quasi-judicial immunity is denied.

Thus, the motion for summary judgment filed by the Board is denied in its entirety, and the motion for summary judgment of all defendants is denied in part and granted in part as described above.

**IT IS SO ORDERED.**